No. 94,415

STATE OF KANSAS, *Appellee*, v. MARC VINCENT SAPPINGTON, *Appellant*.

(169 P.3d 1096)

Opinion filed November 2, 2007.

*Sarah Ellen Johnson,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jerome A. Gorman,* district attorney, argued the cause, and *Paul J. Morrison,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: Marc Vincent Sappington directly appeals his convictions of three counts of first-degree murder, one count of kidnapping, and one count of aggravated burglary against four different victims. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

Approximately 2 months after these convictions, Sappington was also convicted of first-degree felony murder and attempted aggravated robbery for a different episode. His appeal from those convictions is the subject of *State v. Sappington,* 285 Kan. 176, 169 P.3d 1107 (2007).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court err in failing to instruct the jury on the defense of voluntary intoxication? No.

2. Did the district court err in refusing to grant Sappington's request for new counsel? No.

3. Did the district court err in refusing to allow the defense to put on certain evidence about Sappington's mother's schizophrenia? No.

4. Did the district court err in refusing to declare a mistrial after the State began to play the videotape of the wrong confession in open court? No.

Accordingly, we affirm the district court and convictions.

## FACTS

Between April 7 and April 10, 2001, three young men in a Kansas City, Kansas, neighborhood were murdered and a woman was kidnapped. Marc Sappington confessed to the crimes, and many of the following facts are contained in his confession.

*Terry Green*

Early in the morning of April 7, 2001, Sappington killed Terry Green by stabbing him at least four times in Sappington's back yard. Sappington was afraid that someone had seen what he did, so he covered the body with a blue tarp and placed it in the back of Green's car. He then parked the car in an antiques mall parking lot in Kansas City, Missouri. The car and Green's body were discovered in the afternoon of April 10, 2001.

*Michael Weaver*

On the morning of April 10, 2001, Michael Weaver's body was found slumped in the front seat of a car parked in an alley near his house.

Weaver and Eric Fennix, Sappington's best friend, were stepbrothers. Alice Wilson, Fennix's mother, testified that she lived in a house with Fennix, Fennix's fiancée, Myah, and Weaver. Wilson was awakened early in the morning of April 10 when Sappington knocked on the front door, saying he needed a screwdriver. She told him to look in the kitchen. He watched television with Wilson for awhile then went upstairs to get a jacket. About 10 minutes later he ran down the stairs and out the back door.

After Sappington left Fennix's house, he stayed in the back yard for several minutes as voices in his head told him to eat flesh. Weaver arrived in the yard a few minutes later. Using a knife Sap-

pington had grabbed while in Fennix's kitchen, he stabbed Weaver. The wound went from Weaver's back completely through his chest. Weaver tried to get in his car and drive away, but crashed into a light pole. A neighbor was awakened by the crash and called the police. Within moments, Sappington heard sirens, so he attempted to move the car away from the accident scene. He abandoned it in a nearby alley before the police arrived.

### Fred Alton Brown

Sappington claims that he had not satisfied the commanding voices in his head, so he killed Fred Alton Brown on April 10 as well. Just hours after killing Weaver, Sappington invited Brown to come to his house and smoke some "wet." The two went to Sappington's basement, where Sappington shot him in the back with a shotgun. Sappington cut off a piece of Brown's leg and tried to eat it. It made him sick, so he went upstairs and fried it. He ate the cooked flesh and drank some of Brown's blood. Sappington then used a maul and knife to dismember the body.

### Anita Washington

Around 9:30 p.m. on April 10, Anita Washington, who lived in the same neighborhood, returned home from the grocery store. While she was parked in her driveway, Sappington knocked on her car window and pointed a gun at her. He got in the back seat and told her to drive to Kansas City, Missouri. Sappington kept saying that he was a "dead man." At some point, he told Washington to pull over so he could drive. After doing so, she exited the car and ran to the nearest house, where she called the police.

Sappington was apprehended on April 12, 2001. He was taken to the police station where he was *Mirandized* and then confessed to all three homicides as well as the kidnapping. The confession was videotaped. After confessing, Sappington took detectives to where he had dumped a piece of Weaver's t-shirt, the keys to Weaver's car, and to another location where he had dumped the keys to Green's car. He was later charged with three counts of first-degree murder and with one count each of kidnapping and aggravated burglary.

Sappington suffers from schizophrenia and admitted using PCP (phencyclidine) during April 2001. In addition to hearing voices telling him to "eat flesh and drink blood" or he would die, he also claims that during that time he suffered from other aural and visual hallucinations. He relied upon the "not guilty by reason of mental disease or defect" defense, claiming that his schizophrenia rendered him incapable of possessing the required criminal intent to commit the charged offenses.

The case was continued several times over 3 years because of alternating periods of Sappington's competency/incompetency. Sappington was evaluated primarily by Dr. William S. Logan, a psychiatrist, who met with Sappington 13 times over that entire period. Sappington was ultimately deemed competent to stand trial in July 2004 and went to trial later that month.

Through Dr. Logan's evaluations, he determined that Sappington suffered from schizophrenia at the time of trial, but he was not able to definitively state that Sappington suffered from schizophrenia in April 2001. Dr. Logan also testified that the effects of PCP use and the symptoms of schizophrenia are virtually the same.

In July 2004, a jury found Sappington guilty of all charges. He received consecutive sentences of three life terms for the first-degree murders, 79 months for the kidnapping, and 32 months for the aggravated burglary.

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The district court did not err in failing to instruct the jury on the defense of voluntary intoxication.*

Sappington admits that he relied solely upon the defense of mental disease or defect under K.S.A. 22-3220. Nevertheless, he contends that the district court erred in failing to independently instruct the jury on the voluntary intoxication defense because there was evidence indicating that he was suffering from a PCP-induced psychosis at the time he committed these crimes. The State responds that Sappington did not request this instruction and accordingly the failure to provide it was not clearly erroneous.

We agree that Sappington did not request or object at trial to the omission of a voluntary intoxication instruction; therefore, a clearly erroneous standard would typically apply. K.S.A. 2006 Supp. 22-3414(3); *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006). Instructions are clearly erroneous if the appellate court finds " ' "there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]" ' " *Cooperwood*, 282 Kan. at 581.

As evidentiary support for the instruction, Sappington argues that when first interviewed in late April 2001, he told Dr. Logan that he attributed the command voices in his head to his PCP use. He also told the police that he was using PCP regularly throughout April 2001, and he claimed that the command voices coincided with heavy PCP use. In his confession, Sappington told the detectives he had been "smoking wet" prior to the crimes. Additionally, during the State's cross-examination of Dr. Logan, the prosecutor asked, "As a matter of fact, he told you . . . that later in that day, he used and when he's talking about the Weaver homicide, he used more wet and began to think he needed to drink blood again. And obviously there he associated the—the usage of the drug with having to drink blood, correct?"

Sappington reinforces his evidentiary support by showing that during the State's closing argument, the prosecutor himself appeared to claim that Sappington's behavior was not due to the mental disease of schizophrenia but due to his voluntary use of PCP. The prosecutor then further appeared to argue that voluntary intoxication was no defense, telling the jury:

"So what Mr. Sappington was trying to tell you is, well, I took some drugs and I voluntarily took these drugs and when I killed somebody because I took drugs, you ought to just find me not guilty. *You ought to just say that I'm not guilty because of mental disease or defect because I went out and chose to use drugs voluntarily.*

"*Ladies and gentlemen, that's not a defense. That's not a defense at all.*

. . . .

"Even if you think these voices that you heard because you took the drugs wants you to drink his blood and eat his flesh, not an excuse at all. The only way it would be an excuse is if he had this legitimate mental disease or defect. . . . It was the drugs that caused him to hear the voices.

. . . .
"[W]e have evidence through his own statement that he was using drugs and it was the drugs that caused it . . . ." (Emphasis added.)

Apparently the prosecutor was attempting to make the point that under Sappington's sole theory of defense in this particular case, voluntary PCP use was not a defense; only a "natural" defect like schizophrenia would qualify as his purported mental disease or defect. The prosecutor explained he was arguing that Sappington had conveniently changed his story from PCP-induced psychosis to schizophrenia only after his counsel had filed the notice of reliance on the defense of mental disease or defect under K.S.A. 22-3219. Consequently, he points out that throughout the later trial, Sappington attempted to establish that he had schizophrenia in April 2001 and that his behavior was a result of that condition, not PCP use. Sappington seems to primarily characterize the prosecutor's comments as an admission that sufficient evidence of PCP use was present to require an instruction on voluntary intoxication.

The prosecutor's argument could be viewed as an assertion that voluntary intoxication is never a legal defense, which is incorrect. While voluntary intoxication is not a complete defense, it is a defense to specific intent crimes. See K.S.A. 21-3208(2). Murder in the first degree—three of the charges in the instant case—is a specific intent crime. K.S.A. 21-3401. Nevertheless, we hold that Sappington's failure to request the voluntary intoxication instruction is fatal to his argument.

Sappington did not rely on the defense of voluntary intoxication. While there is evidence of voluntary intoxication through PCP use, Sappington elected to proceed strictly under a mental disease or defect defense. " ' " 'It is the duty of the trial court to properly instruct the jury upon a party's theory of the case.' " ' " *In re Care & Treatment of Foster*, 280 Kan. 845, 864, 127 P.3d 277 (2006). As a result, after Sappington requested instructions only on the mental disease or defect defense, the district court instructed on only that theory.

We acknowledge the general rule in criminal cases is that even inconsistent defenses are generally permissible. *State v. Hunter*, 241 Kan. 629, 643, 740 P.2d 559 (1987). We specifically acknowl-

edge that "a defendant in a criminal case may rely upon voluntary intoxication to show a lack of specific intent even though he also relies upon other defenses which may be inconsistent therewith." *State v. Shehan*, 242 Kan. 127, 131, 744 P.2d 824 (1987). But we further acknowledge that "it is fundamental to a fair trial that the accused be afforded the opportunity to present his or her theory of defense," *State v. Humphrey*, 252 Kan. 6, 14, 845 P.2d 592 (1992), and believe that imposing a defense upon a defendant which is arguably inconsistent with the one upon which he completely relies—by providing the jury a defense instruction that neither party requests—is akin to denying the defendant the meaningful opportunity to present his chosen theory of defense. A *sua sponte* instruction on voluntary intoxication runs the considerable risk of improperly interfering with Sappington's chosen defense and resultant trial strategy, which were presumably selected after consideration, and rejection, of other alternatives.

We note, for example, that K.S.A. 21-3107(3) formerly provided: *"It is the duty of the trial court to instruct the jury,* not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty . . . upon the evidence adduced." (Emphasis added.) And our cases interpreted that language to essentially impose a *sua sponte* obligation to instruct on the trial court. See, *e.g.*, *State v. Boyd,* 216 Kan. 373, 376, 532 P.2d 1064 (1975) (duty to so instruct even though such instructions have not been requested or have been objected to). That provision—which concerns types of inconsistent defenses, *e.g.*, the difference between the elements of the crime charged and its lesser included offenses—was eliminated by the legislature in 1998. Accordingly, at present we can see no valid reason to require district courts to instruct juries on every possible theory of defense for which some evidence has been presented when the defendant has not relied upon that defense. In short, in the instant case the district court did not err in failing to instruct on voluntary intoxication.

Issue 2: *The district court did not err in refusing to grant Sappington's request for new counsel.*

Sappington next contends the court erred in denying his multiple requests for new counsel. The State basically responds that his counsel did a commendable job under difficult circumstances. We independently observe that over a 3-year span, from his April 2001 arrest through his July 2004 trial, Sappington was found mentally competent, then incompetent, then competent, then incompetent, and then competent. Each of Sappington's motions to change counsel was filed during periods of competency, with the trial being conducted within the same month of his latest competency determination.

A district court's refusal to appoint new counsel is reviewed under an abuse of discretion standard, which asks whether any reasonable person would take the view adopted by the district court. *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006). The burden is on the party alleging the abuse. *State v. White*, 280 Kan. 333, 342, 161 P.3d 208 (2007).

Furthermore, to warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. *McGee*, 280 Kan. at 894. But ultimately, " '[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel. [Citation omitted.]' " *State v. Ferguson*, 254 Kan. 62, 70, 864 P.2d 693 (1993) (quoting *State v. Banks*, 216 Kan. 390, 394, 532 P.2d 1058 [1975]).

After being found competent to stand trial, Sappington filed his first pro se "Motion for Relief of Court Appointed Counsel" on March 25, 2002. He alleged that irreconcilable conflicts of interest existed, specifically that he lacked confidence in attorney Patricia Kalb's representation and that she was not providing "faithful representation." Sappington later withdrew the motion with the hope that he and Kalb "could work through the problems."

In January 2003 Sappington was found incompetent to stand trial because, among other things, his attorney stated that voices

were telling him not to talk to her, and Dr. Logan determined that he was unable to "consult with his attorney in preparing his defense." The January trial was postponed. In April 2003, he was again found competent, and trial was rescheduled for the following August.

On June 17 Sappington stopped taking his medications and his counsel filed for a trial continuance. On July 9 he filed another motion for relief of counsel. It was nearly identical in content to the March motion except that it also alleged a "complete breakdown in communication with his counsel."

On July 28, 2003, the court held a hearing on Sappington's July 9 motion. There, Sappington told the court that Kalb failed to comply with his "reasonable requests" or failed to do so in a timely manner. Sappington provided the court with his letters to Kalb requesting copies of statements of witnesses and the preliminary hearing transcript. He also stated that Kalb failed to speak with him enough regarding possible plea agreements and different aspects of his case.

Kalb testified that she had met with Sappington the previous day to discuss their problems. She did not feel that their problems were "that serious." Kalb stated that Sappington's mental health problems had been the cause of many of the delays in this matter. She admitted that it had taken some time to get the witness statements from the State and that it had taken a while to get the transcript, but that the "more important" issue was that she and Sappington were having a "hard time" communicating regarding his theory of defense. Kalb seemed to imply that this difficulty was largely due to Sappington's mental status and stated that she had tried to convey to him her thoughts on a defense.

The court denied Sappington's motion. It informed him that the defendant always has the final say in his defense, that his had been one of the more serious and complex cases in the county's recent history, and that his mental status had caused some delay. It found no legal sufficiency in Sappington's argument and stated that it would not change counsel with a trial date set for 1 week from the day of the hearing. The court concluded that Kalb had zealously

guarded Sappington's constitutional rights and that it could find no fault in her representation.

Within the week, the August 2003 trial was postponed because Sappington again stopped taking his medication, and he was again found incompetent. Trial was eventually rescheduled for February 2004. That trial was later postponed because of Sappington's continued incompetence and Dr. Logan's characterization of his "partial malingering."

In July 2004 Sappington was once again found competent, and trial began on the 19th of that month. That morning Sappington made an oral motion to dismiss counsel. He claimed there was a conflict of interest, that Kalb lied to him on many occasions, and that he did not trust her representation. When asked for more details, Sappington said she lied that she would come see him and that she did not bring him documents. He could not identify any specific documents or occasions. Kalb denied ever lying to him and stated she had brought him even more than he had ever requested, *e.g.*, all witness statements and the transcript.

The court again denied Sappington's motion, observing that Sappington brought the motion the morning of trial. It also found that there was no legal or factual basis for granting the motion and referred to Kalb's representation as "first rate," adding it felt no stone had been left unturned in Sappington's defense by his counsel. It noted "[w]e have been anticipating coming to trial . . . since 2001" and "every avenue in your defense has been explored taking considerable time from this Court and all of the parties involved."

Sappington renewed his motion at the close of evidence. He requested a mistrial because Kalb did not ask all of the questions that he requested. Kalb responded that at least two of the questions were irrelevant and the answers would not have been in Sappington's best interest. Sappington claimed that throughout trial, Kalb would not cooperate with his requests and that he did not believe Kalb did everything she could have to defend him. After receiving this information the court overruled the motion.

On August 27, 2004, Kalb argued a motion for new trial, including at Sappington's request a claim that new counsel should have

been appointed. The court denied the motion, finding, among other things, that no one could say that counsel had not performed competently and nothing had ever led the court to believe that defendant and his counsel were anything other than prepared to go to trial.

To begin our analysis, we note that in order to determine whether to appoint new counsel, the district court must conduct some sort of investigation. Here, the court satisfied this requirement by fully hearing Sappington's complaints, both at the motion hearing and certainly the trial, and fully hearing his counsel's responses. The court further satisfied this requirement by its own observations of counsel's performance over the course of 3 years. See *State v. Collier*, 259 Kan. 346, 359, 913 P.2d 597 (1996). Sappington had the same attorney, Kalb, throughout the instant case. Her performance observed by the court included multiple actions to protect Sappington's rights regarding his competency to stand trial and other pretrial matters. The court concluded that Kalb had performed at a high level of advocacy on Sappington's behalf.

The district court was also well aware of the unique circumstances of this case. Throughout this lengthy process, an overarching consideration was seeing if Sappington was capable of being found competent to stand trial. As a result, the court was quite cognizant of the substantial challenges any counsel would have faced representing Sappington. In an analogous context, the court in *State v. Ferguson* observed that a lack of communication between a defendant and counsel does not automatically constitute a violation of the Sixth Amendment right to counsel. 254 Kan. at 71. There, the court agreed with the State that " 'lack of communication between a defendant and defense counsel *due to a defendant's refusal to cooperate* is not of itself basis for reversal on grounds of ineffective assistance of counsel.' " (Emphasis added.) 254 Kan. at 73-74. The *Ferguson* court held that under the circumstances of that case, substitution of counsel would have been futile.

In Sappington's case, there were multiple competency and incompetency determinations. The district court was forced to continue trial several times after finding that Sappington was not competent to stand trial or able to assist in his own defense. Based on

the competency evaluations and Kalb's statement at the July 2003 hearing on Sappington's motion, it is doubtful the appointment of substitute counsel would have solved the communication problems. Concerning Sappington's oral motion made on the first day of trial, he clearly failed to establish a "complete breakdown of communication" between him and counsel.

Another consideration is the timeliness of Sappington's motion. This court has held that a request for substitute counsel made on the first day of trial is not timely. *State v. Collier*, 259 Kan. at 358-59. Although, as Sappington points out, his oral trial motion was not his first request for new counsel, he has provided no explanation for his delay in filing an additional request.

Finally, the record reveals that Kalb protected Sappington throughout the case. She was diligent in monitoring Sappington's mental health, frequently requesting a continuance or a finding that Sappington was incompetent to stand trial at that time. Kalb filed several motions throughout the case and was otherwise diligent in presenting the best case possible. As the State points out, several times throughout trial, Kalb requested a short break to meet with her client. She also approached the bench on more than one occasion, explaining to the judge that she would be asking questions that Sappington requested that she ask. The State points out that defense counsel "asked the court numerous times throughout the trial for a moment to confer with her client." Sappington does not allege that he disagreed with Kalb's trial strategy.

In light of the foregoing, the court had a reasonable basis for believing that the attorney-client relationship had not deteriorated to a point where Kalb could no longer effectively aid Sappington in the fair presentation of his defense. Sappington failed to show "justifiable dissatisfaction" with his counsel, *e.g.*, a complete breakdown in communications. Accordingly, the district court did not abuse its discretion in denying Sappington's motions.

Issue 3: *The district court did not err in refusing to allow the defense to put on certain evidence about Sappington's mother's schizophrenia.*

Sappington argues that his right to a fair trial was violated because the district court excluded certain evidence that was an integral part of his theory of defense. See *State v. White*, 279 Kan. 326, 331, 109 P.3d 1199 (2005). The State responds that a defendant's right to present his or her defense is subject to statutory rules and case-law interpretation of rules of evidence and procedure. See 279 Kan. at 331.

Our decision in *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006), provides a road map for our analysis of this evidentiary issue. When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance. Unless otherwise prohibited, all relevant evidence is admissible. K.S.A. 60-407(f). "Relevant evidence" is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). A material or logical connection between the asserted facts and the inference or result they are intended to establish are necessary to establish relevance. 282 Kan. at 47 (citing *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 [1999]).

*Gunby* further explained our possible standards of review:

"Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted.] When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." 282 Kan. at 47-48.

Because the adequacy of the district court's legal basis for excluding evidence is not being questioned, our review is for abuse of discretion.

As mentioned in Issue 1, Sappington's defense was not guilty by reason of mental disease or defect. Throughout trial, Sappington attempted to prove that he suffered from schizophrenia in early April 2001, and that his criminal behavior was its result. As part of this endeavor, Sappington sought to establish a link between the schizophrenia of his mother, Mary White, and his own behavior. The district court excluded two pieces of Sappington's evidence on this issue: medications Mary was taking, which would have established that she suffered from schizophrenia; and her behavioral

symptoms that were allegedly similar to his own, which would purportedly establish that he also suffered from schizophrenia at the time of the crimes.

Dr. Logan testified that schizophrenia has a genetic component; therefore, the mental health of Sappington's family is relevant.

As for the medication evidence, during Dr. Logan's direct examination defense counsel attempted to put into evidence three of Mary's prescriptions. One of the prescriptions was for a psychotropic drug, which counsel contended would demonstrate that Mary was schizophrenic. The State objected to their admission, claiming that Dr. Logan did not know for whom or what they had been prescribed. The court sustained the objection, agreeing with the State's foundation objection and noting that Sappington had already established that Mary was schizophrenic.

While this testimony may have a tendency to prove a material fact—that Mary suffered from schizophrenia—it still may be properly excluded. We agree the court did not abuse its discretion in refusing to allow Dr. Logan to comment regarding medications he did not prescribe and which were prescribed to a patient he had not evaluated. Additionally, we agree that the testimony was cumulative as Sappington had already established that Mary was schizophrenic through the testimony of her brother, Rufus White. See *State v. Torres,* 280 Kan. 309, 333, 121 P.3d 429 (2005) ("[W]hether otherwise relevant evidence is cumulative is a matter of discretion for the trial court.").

As for the evidence of Mary's behavior attempted to be introduced through White, we observe that Sappington did not establish that her behavior was the exclusive result of schizophrenia. Both White and Dr. Logan testified that Mary also suffered from a bipolar disorder. Because Dr. Logan testified about considerable overlap in the symptoms for bipolar disorder and schizophrenia, Mary's symptoms could have been the result of either disease. Similarly, we observe that Sappington used PCP, and Dr. Logan repeatedly testified that the symptoms of PCP use and schizophrenia are identical. Accordingly, he could not tell whether Sappington's behavior was the result of PCP use or schizophrenia. Finally, we observe that even if both Mary and Sappington clearly suffered

only from schizophrenia, Sappington failed to present any testimony that family members with schizophrenia usually exhibit the same symptoms, *i.e.*, Sappington's behavior would expectedly parallel Mary's. Consequently, the trial court did not abuse its discretion in limiting testimony of Mary's symptoms.

Issue 4: *The district court did not err in refusing to declare a mistrial after the State began to play the videotape of the wrong confession in open court.*

Finally, Sappington claims that the trial court erred in refusing to declare a mistrial after the State began to play the videotape of the wrong confession in open court. The State responds that the mistake did not make it impossible to proceed without injustice to Sappington.

K.S.A. 22-3423(1) states:

"The trial court *may* terminate the trial and order a mistrial at any time that he finds termination is necessary because . . . (c) [p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." (Emphasis added.)

As a general rule, a motion for a mistrial is reviewed under an abuse of discretion standard, and the party alleging the abuse bears the burden of proving that "his or her substantial rights to a fair trial were prejudiced." *State v. White*, 284 Kan. at 343. This court also examined a court's duty to declare a mistrial in *White*:

"It is necessary when justice so requires to declare a mistrial where there is some fundamental failure of the proceeding. When an event of prejudicial misconduct, the damaging effect which cannot be removed by admonition and instruction, is presented to the jury, the trial judge must declare a mistrial." 284 Kan. at 343.

In March 2001, approximately 1 month before the events in this case occurred, Sappington was also involved in a shooting in which David Mashak was killed. Sappington's resultant trial on first-degree felony murder and attempted aggravated robbery charges occurred in late September 2004, approximately 2 months after the trial in the instant case. See *State v. Sappington*, 285 Kan. 176, 169 P.3d 1107 (2007). At the beginning of Sappington's trial for the triple murder, he requested an order in limine to prohibit any

mention of the allegations in the Mashak case during this trial. The State made no objection, and the trial judge granted the order.

During the State's case-in-chief, Detective Greg Lawson testified about the details of Sappington's confession. The State asked Detective Lawson to play the videotaped confession for the jury. As the tape began to play, the prosecutor asked the detective to shut the tape off and approached the bench for a conference out of hearing of the jury.

During that conference, the prosecutor told the court that it looked like the wrong videotaped confession was starting to play. He explained that he picked up the wrong tape from counsel table and believed the tape that had been playing was from the Mashak homicide. The record reveals that the tape played for a short period of time. The jury only heard a detective begin to *Mirandize* Sappington—no questions were asked and no information about the instant case was revealed.

Sappington then moved for a mistrial. Defense counsel Kalb explained that the Mashak tape showed Sappington wearing an orange jail suit, while in the correct confession tape, he was wearing street clothes. She argued that the jury would "know something was up" and it would be "obvious it's a different time about a different matter." The judge offered to give a curative instruction, but she declined, saying "any explanation would make it worse."

We hold that Sappington has not met his burden of showing his substantial rights to a fair trial were prejudiced. Similarly, although the playing of the wrong tape violated the court's order in limine, Sappington has not shown that the facts elicited in violation of the order substantially prejudiced him. See *State v. Gleason*, 277 Kan. 624, 640, 88 P.3d 218 (2004). He assumes that the jury would infer from the jail suit that he was being questioned about a separate incident. This is not the only logical conclusion, however. The jury could reasonably have concluded that Sappington was questioned by police multiple times in this case, as he was charged with five separate crimes against four different victims. Additionally, the jury was never told that the tape was from another case, nor did it hear any facts suggesting that the tape was from a separate incident.

Sappington refused a curative instruction, and no additional attention was drawn to the mistake.

We conclude the district court did not abuse its discretion in refusing to declare a mistrial. Affirmed.

DAVIS, J., not participating.

GREENE, J., assigned.