NOT DESIGNATED FOR PUBLICATION

No. 114,611

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LARRY E. LONGBINE,
*Appellant*.


MEMORANDUM OPINION

Appeal from Harper District Court; LARRY T. SOLOMON, judge. Opinion filed December 23, 2016. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, of the Office of Kansas Attorney General, for appellee.


Before STANDRIDGE, P.J., ARNOLD-BURGER and BRUNS, JJ.


*Per Curiam*: Larry E. Longbine was convicted of aggravated indecent liberties after his step-granddaughter testified that Longbine was touching her inappropriately. Longbine appealed his conviction, making several arguments: (1) the district court erred by denying a mistrial, following an order in limine violation; (2) the district court erred by excluding evidence that the victim had previously made a false accusation of sexual misconduct; (3) the district court erred by admitting unduly prejudicial evidence of Longbine's prior sexual misconduct; (4) that the State improperly appealed for victim

1

sympathy during closing argument; and (5) that cumulative errors require reversal. Finding that the district court did not err on any of the grounds alleged, we affirm.

FACTUAL AND PROCEDURAL HISTORY

In January 2008, P.H. disclosed to a school counselor that her step-grandfather, Larry E. Longbine, would rub her back and it made her uncomfortable. P.H. was clear that Longbine did not touch her anywhere except her back. P.H. was in second grade at the time. The school called K.A., P.H.'s mother, and K.A. contacted the police. The police informed K.A. that there was nothing they could do. K.A. took P.H. to counseling at Horizon's Mental Health Center. At counseling P.H. reiterated that Longbine would rub her back and make her uncomfortable, but denied that Longbine touched her anywhere else. After P.H.'s disclosure to the school counselor, K.A. did not let her visit Longbine again.

When P.H. was in middle school, she participated in a girls' youth group. At a meeting of the youth group in November 2011, one of the girls spoke about how she was feeling sexual pressure from her boyfriend. P.H. said, "'You should never have to go through that; nobody should ever have to go through that. And I went through that, and nobody should ever have that to go through that.'" The youth group leader asked to speak with P.H. after the meeting and when they spoke P.H. "said that her grandfather had touched her inappropriately in the past." The youth group leader contacted the police.

Deputy Chief Matthew Schultz was the investigating officer on the case. He interviewed P.H. After the interview with P.H., when Deputy Schultz was discussing the matter with K.A., K.A. disclosed that she had also been a victim of Longbine. A couple of weeks later, Deputy Schultz contacted Janet Stonehocker (K.A.'s mother and Longbine's wife). Stonehocker told Deputy Schultz that K.A. had disclosed sexual abuse by Longbine, but Stonehocker did not believe K.A. After this, Deputy Schultz

2

interviewed K.A. K.A. told Deputy Schultz that Longbine had begun abusing her when she was 8 years old and stopped when she was 15 or 16. Longbine began by rubbing her back, but then "he would take her panties off and rub her in between her legs." Both P.H. and K.A. went to Horizon's Mental Health Center for forensic interviews.

In February 2013, the State charged Longbine with two counts of rape, one count of aggravated indecent solicitation of a child, and one count of lewd and lascivious behavior for events occurring between July 1, 2007, and January 29, 2008. The State later amended the rape charges to aggravated indecent liberties charges. The district court bound Longbine over on two charges of aggravated indecent liberties, one charge of aggravated solicitation of a child, and lewd conduct.

Trial began in October 2014. But, the district court granted a motion for a mistrial after one of the State's witnesses violated a motion in limine. Another trial occurred in April 2015.

At trial, P.H. testified that Longbine's abuse began when she was 4 years old. She was in the living room at her grandparents' house with Longbine. P.H. was afraid of her grandparents' dogs, so she got into a chair with Longbine and sat on his lap. Longbine began rubbing P.H.'s back with his hand. Longbine's hands began on top of her clothes, but then went underneath her clothes. P.H. also said he touched her chest underneath her shirt during this incident. During cross-examination, P.H. acknowledged that, when she had previously testified about the incident, she said that Longbine only touched her shoulder. P.H. described another incident in the chair when she was 7 years old. Longbine put his hand inside of her panties and left it there.

P.H. next described an incident in which she was 6 or 7 years old and the night light in her room at her grandparents' house went out. P.H. went to get into her grandparents' bed because she was afraid of the dark. P.H.'s grandmother had to get up

3

and go somewhere, so P.H. and Longbine were alone in the bed. P.H. told Longbine she was cold, and Longbine wrapped his legs around hers. Longbine slid P.H.'s nightgown up with his hand and rubbed her back. Then, Longbine put his hand in her pants, underneath the front of her panties, and rubbed her vagina. P.H. did not say anything, but got up and waited in the bathroom until her grandmother got home. On cross-examination, P.H. acknowledged that she previously testified that Longbine had not made skin-to-skin contact, but had only put his hand on the outside of her panties.

P.H. also testified that Longbine would take her fishing and rub her back. Sometimes, on these occasions, "he would stick his hand in the back of [P.H.'s] pants underneath [her] underwear" and just leave his hand there until she got up and moved. The final incident P.H. described occurred when she was in second grade. P.H. said that Longbine asked her "if [she] thought that boys and girls had the same parts." Longbine did not touch her, but he did pull his penis out of his underwear.

P.H. said the abuse ended when she was 7 years old and told her school counselor that Longbine gave her backrubs that made her uncomfortable. P.H. said she did not tell the full story to the school counselor "[b]ecause [she] felt disgusting." P.H. testified that she regularly visited her grandparents before she made the disclosure to the school counselor.

K.A. also testified. K.A. said that she was 5 years old when her mother married Longbine and that she was 7 years old when Longbine began abusing her. It began with wrestling and tickling, but progressed to back rubs and then rubbing K.A.'s bottom, chest, and in between her legs. Sometimes it was on the outside of her clothing and sometimes it was inside. K.A. testified that Longbine became more aggressive as time went on by pushing K.A.'s pelvic area toward his groin area. K.A. said that Longbine would also take her fishing. During fishing trips, Longbine would rub K.A.'s back and sometimes have her pull her pants down to her ankles so he could rub her bottom. K.A. tried to tell her

mother, but her mother "told [K.A.] not to say anything because DHS would take everybody away and [K.A.] would be sent away and [K.A.] wouldn't see [her] little brothers again."

K.A. testified that she moved into her mother and Longbine's house when K.A. became pregnant with P.H. because K.A. had nowhere else to go. K.A. told her mother that she did not want P.H. alone with Longbine. Eventually, K.A. moved into an apartment but would frequently allow P.H. to visit her grandmother and Longbine. When asked if she hesitated before allowing P.H. to visit Longbine's house, K.A. said "I did hesitate, but my mom had a control issue and if I chose to send my daughter somewhere else, she would threaten to call SRS and throw up grandparents' rights. So, yes, I did hesitate, but there was nothing I felt at that time I could do about it." K.A. added that she was willing to let P.H. visit Longbine's house because K.A.'s mother promised not to leave Longbine alone with P.H.

Stonehocker, K.A.'s mother and Longbine's wife, testified. Stonehocker said that when K.A. was young, she told Stonehocker that Longbine bothered her, but never said that Longbine touched her in a sexual manner. Stonehocker said that K.A. would ask Longbine to rub her back. Stonehocker noted that, after a fishing trip with Longbine, P.H. did not want to be around Longbine anymore. However, Stonehocker said that neither P.H. nor K.A. disclosed any abuse by Longbine. Finally, Stonehocker did say that she threatened K.A. with calling SRS when Stonehocker did not think K.A. was taking care of P.H.

Longbine testified, and denied inappropriately touching either P.H. or K.A.

At the conclusion of the State's case in chief, Longbine made a motion for judgment of acquittal as to Counts III (aggravated indecent solicitation of a child) and IV (lewd and lascivious conduct). The district court dismissed Count III. The jury found the

5

defendant not guilty of the first count of aggravated indecent liberties (in the chair), guilty of the second count of aggravated indecent liberties (in the bed), and not guilty of lewd and lascivious behavior. The district court sentenced Longbine to lifetime imprisonment with a mandatory minimum term of 25 years without the possibility of parole. Longbine appealed.

ANALYSIS

*The district court did not err in denying Longbine's motion for a mistrial.*

Longbine's first argument is that the district court erred in denying his motion for a mistrial following a motion in limine violation at trial.

Prior to trial, the State filed a K.S.A. 2015 Supp. 60-455 motion. The State sought to introduce evidence of uncharged sex offenses against P.H., as well as uncharged sexual abuse of Longbine's stepson, younger sister, and K.A. The district court ruled that evidence regarding Longbine's stepson and younger sister was inadmissible. But, the evidence concerning P.H. and K.A. was relevant and more probative than prejudicial. Thus, the district judge allowed evidence pertaining to P.H. and K.A. to be admitted under K.S.A. 2015 Supp. 60-455(d), but disallowed the admission of evidence regarding the other two—Longbine's stepson and younger sister.

At trial, Deputy Schultz was explaining why he wanted to interview K.A. Deputy Schultz stated: "Through the course of the investigation that had come out that possibly there were other *victims*, and I knew that [K.A.] was one of those, and I wanted to speak with [K.A.] about her specific abuse." (Emphasis added.) Longbine's attorney asked to approach the bench, noted that Deputy Schultz violated the motion in limine by referencing other victims, and made a motion for a mistrial. The district judge said the violation was "inexcusable after what we went through last time" (referencing the first

6

mistrial). But, the district judge said the violation was not "prejudicial to the point of requiring a mistrial at this point in time." The district judge offered Longbine a curing instruction, but he refused because he did not want to draw the jury's attention to the comment.

K.S.A. 22-3423 states that a "trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because . . . (c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." The Kansas Supreme Court outlined the following two-step process for district courts to evaluate motions for mistrials in *State v. Santos-Vega*, 299 Kan. 11, 23, 321 P.3d 1 (2014):

> "First, [the district court] determines if there was a fundamental failure in the proceeding. If so, it next determines if it is possible to continue without injustice by examining whether the damaging affect can be removed by admonition, jury instruction, or other action. If not, the court must determine whether the degree of prejudice results in an injustice; and if so, it should then declare a mistrial."

An appellate court reviews a trial court's denial of a motion for mistrial under the abuse of discretion standard. *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015).

> "Judicial discretion is abused if judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Davisson*, 303 Kan. 1062, 1065, 370 P.3d 423 (2016) (citing *State v. Beaman*, 295 Kan. 853, 865, 286 P.3d 876 [2012]).

The first step of the appellate review is determining whether the district court abused its discretion in determining that there was a fundamental failure in the proceeding. As Longbine acknowledges, the district court did not use the words "fundamental failure" in ruling on Longbine's motion for a mistrial. However, Longbine argues that "[g]iven the tenor of its ruling, it seems that the court felt that a fundamental failure in proceedings had occurred."

The district court is not required to expressly use the words "fundamental failure." In *State v. Kleypas*, 305 Kan. 224, 382 P.3d 373 (2016), a courtroom spectator attacked the defendant during sentencing and the defendant made a motion for a mistrial, which the district court denied. The Kansas Supreme Court said that "[d]espite the fact that the district court did not use the words 'fundamental failure,' . . . the district court clearly felt those words applied." 382 P.3d at 413. This was because "[t]he district court told the jury that the events were 'obviously very inappropriate and it has no place in a Court of law in the United States' and in doing so conveyed that a fundamental failure had occurred." 382 P.3d at 413. Furthermore, "the district court proceeded as if there had been a fundamental failure by admonishing the jury to disregard the incident." 382 P.3d at 413; see also *State v. Rincon*, No. 113,741, 2016 WL 3856670, at *6 (Kan. App. 2016) (unpublished opinion) (noting that the district court did not make an explicit finding that there was a fundamental failure, but "the district court's offer to give a limiting instruction supports the assumption that the district court believed the testimony was at least erroneous and could prejudice [the defendant]"). Here, the district court called Deputy Schulz' statement "inexcusable." Additionally, the district court offered a curing instruction. Similar to *Kleypas*, this suggests that the district court found a fundamental failure.

The State argues that there was no fundamental failure in the proceedings because there was no motion in limine order violation. The State explains: "While the district court, in ruling on a K.S.A. 60-455 motion, limited the admission of certain evidence regarding other *specific* and named alleged victims, at no point was there an order saying

8

no one could mention that the investigation led to the belief of the possibility of other victims." Longbine responded to this by stating that "[w]hile the district court did not technically forbid the State from eliciting evidence regarding alleged sex abuse of [Longbine's stepson and sister] from the testimony of other witnesses, this was implied by the court's ruling."

The district court ruled that evidence pertaining to two of Longbine's alleged victims was inadmissible. So, it would be a clear violation of the motion in limine order if Deputy Schultz had specifically referred to either of those alleged victims. It follows that if Deputy Schultz referred to other alleged victims generally then he also violated the order. Deputy Schultz' reference to "other victims" could reasonably be construed as a reference to the alleged victims that he was prohibited from specifically referencing. Furthermore, it was the understanding of both parties and the district court judge that Deputy Schultz violated the order.

However, just because a motion in limine is violated does not necessarily mean that a fundamental failure in the proceedings necessitating a mistrial has occurred. See *State v. Sappington*, 285 Kan. 158, 174-75, 169 P.3d 1096 (2007) (affirming district court's denial of mistrial because while "the playing of the wrong tape violated the court's order in limine, Sappington has not shown that the facts elicited in violation of the order substantially prejudiced him"). "To determine whether an error makes it impossible to proceed with the trial without injustice and requires a mistrial, a court must assess whether the fundamental failure affected a party's substantial rights under the harmless error statutes, K.S.A. 60-261 and K.S.A. 60-2105 . . . ." *Santos-Vega*, 299 Kan. at 23. If a right guaranteed by the United States Constitution is implicated, then the error must be assessed under the constitutional harmless error standard. 299 Kan. at 23-24. Longbine does not allege a violation of his constitutional rights. Thus, whether there was a fundamental failure affecting Longbine's rights will be addressed under K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105.

9

In *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), the Kansas Supreme Court held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." Where an error implicates a statutory but not federal constitutional right, which is what Longbine argues, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Here, the State successfully argues that the motion in limine violation (assuming there was one) did not affect the trial's outcome. The district judge said that he did not "think the jury is inordinately focused on the plural at this point in time, and they're going to hear about [K.A.]'s experiences." This was a reasonable conclusion. Detective Schultz' comment was innocuous—it was brief and no attention was drawn to it. Also, the detective did not conclusively say that there were other victims, just that there might be other victims. The jury knew that there were victims other than P.H. because K.A. testified that she was a victim of Longbine. Moreover, the jury was instructed that it was only allowed to consider admitted evidence. It is generally presumed that jurors follow the district court's instructions. *State v. Peppers*, 294 Kan. 377, 392, 276 P.3d 148 (2012). Evidence pertaining to Longbine's victims, other than K.A. and P.H., was not admitted. So, the jury could not consider it. Therefore, the district court did not abuse its discretion in denying Longbine's motion for mistrial.

*The district court did not err by excluding evidence of a prior incident involving the victim.*

Longbine's second argument is that the district court erred by excluding evidence regarding the victim's credibility.

10

After P.H.'s second grade disclosure to her school counselor that Longbine's touching made her uncomfortable, P.H. had follow-up visits with the counselor. In a follow-up visit, "P.H. reported that a third grade boy looked under her skirt and was touching her and another girl." The counselor interviewed P.H. and the other girl and determined that the story had "'no credibility.'" Prior to trial, the State filed a motion seeking an order in limine to exclude any evidence or inferences regarding the third grade boy story as well as the counselor's opinion that the story had no credibility. The State cited K.S.A. 2015 Supp. 21-5502, the rape shield statute, as a basis for its motion.

At the pretrial motions hearing, the district judge granted the State's motion but said that he would "have no problem revisiting an order in limine if the playing field changes." The parties did revisit the motion after the first mistrial. Longbine's counsel noted that P.H. told the school counselor about the third grade boy just over a week after disclosing Longbine's backrubs. Then, in P.H.'s next appointment with the counselor, P.H. told the counselor that she was concerned that her grandmother did not believe her disclosure about Longbine. Longbine's attorney argued that the counselor's determination that the third grade boy story was not credible was "very much related" to P.H.'s complaint that her grandmother did not believe her. Longbine also argued that the State opened the door to testimony on P.H.'s credibility by presenting evidence that P.H.'s grandmother did not believe her. The district judge disagreed, stating "I think a totally unrelated incident is distant and not particularly relevant or probative on whether or not Mr. Longbine did or did not do what he's accused of . . . ." Additionally, the evidence was a "direct conclusion by [the counselor] as to the credibility of [P.H.] in this unrelated situation" and was also inadmissible for that reason. Longbine's counsel raised the issue again at the second trial and the district court noted that the issue was preserved for review.

On appeal, Longbine makes a different argument than the argument presented to the district court. Longbine recognizes that "[p]utting on evidence that a witness has

11

made a prior false sex abuse accusations is, seemingly restricted by K.S.A. 60-422(d)." But Longbine argues that he has a constitutional right to confront witnesses testifying against him and present his own defense.

Parties cannot generally raise constitutional issues for the first time on appeal. This rule has three exceptions, but in order to take advantage of the exceptions appellants must explain "why the issue is properly before the court." Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41). Here, as the State points out, Longbine does not explain why his constitutional argument is properly before this court. Longbine does not make any arguments regarding relevancy or the application of the statutory rules of evidence. An issue not briefed by the appellant is deemed waived or abandoned. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016). We find that to be the case with Longbine's new constitutional argument.

*The district court did not err in the admission of evidence of uncharged sex offenses.*

As discussed, the State filed a K.S.A. 2015 Supp. 60-455 motion prior to trial. The State sought to introduce evidence of uncharged sex offenses committed against P.H., as well as uncharged sexual abuse of Longbine's stepson, younger sister, and K.A. The district judge allowed the State to admit evidence pertaining to P.H. and K.A., but not pertaining to the other two people. Longbine is only challenging the district court's decision to admit evidence pertaining to sexual abuse of K.A. Longbine argues that the evidence pertaining to K.A. was more prejudicial than probative, and that the district court should have excluded it.

The district judge's reasoning for admitting K.A.'s allegations of sexual abuse was as follows:

"[T]here is a significant set of circumstances that show a similar pattern of how the abuse occurred with her in terms of back rubs, wanting her to wear nightgowns, taking her fishing, and what occurred when they were fishing. And I think those incidents fall into the same category as the uncharged offenses with PH. I think it is relevant both as to plan and similar acts and similar circumstances, but relevant on propensity under 455(d) and there is such a similarity in what occurred that again I think it is more probative than prejudicial because if the jury believes her—and I know she's got a lot of baggage—if the jury believes her, it's not likely to lead to an incorrect verdict because there's just so much similarity in how [Longbine] dealt with [K.A.] and how he dealt with PH, if they believe her."

The district judge added that "[t]here really isn't any less prejudicial evidence than trying to create a pattern of conduct over 20 or 25 years involving the people in [Longbine's] adult household . . . ."

A trial court has discretion to exclude evidence where the court finds its probative value is outweighed by its potential for producing undue prejudice. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013). An appellate court reviews any such determination for an abuse of discretion. 298 Kan. at 291. As previously noted, judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable or based on an error of law or fact. *Davisson*, 303 Kan. at 1065.

In 2009, the Kansas Legislature amended K.S.A. 60-455(d) to permit "evidence of other acts or offenses of sexual misconduct to show propensity . . . and 'any matter to which it is relevant and probative' in sex crime cases." *State v. Prine*, 297 Kan. 460, 476, 303 P.3d 662 (2013); L. 2009, ch. 103, sec. 12. Prior to the amendment, district judges were required to "balance the probative value of other crimes or civil wrongs evidence against the threat of undue prejudice." *Prine*, 297 Kan. at 478. Since the amendment, the Supreme Court has continued to support the judge's duty to weigh the probative value of

13

the evidence against the prejudicial effect of its admission. See *State v. Bowen*, 299 Kan. 339, 350, 323 P.3d 853 (2014).

Here, as the district court found, the evidence was highly probative of the facts it was admitted to prove due to the similarity in how K.A. and P.H. described the progression of Longbine's abuse. They both experienced back rubs, fishing trips, and uncomfortable touching beginning at a young age. A reasonable person could find that such evidence had a logical tendency to prove Longbine's propensity to commit the offenses P.H. was alleging, thus the district court did not abuse its discretion in finding that the evidence was probative.

The next issue is whether the risk of undue prejudice outweighs the highly probative nature of the evidence. Longbine's primary argument that K.A.'s testimony was unduly prejudicial is that evidence of K.A.'s abuse was "unproven, and hotly contested." Additionally, "the State presented no evidence that corroborated K.A.'s allegations of abuse." Longbine does not cite any caselaw to support his position. However, an analysis of the balancing factors and a review of the caselaw reveals that the district court did not abuse its discretion in admitting the evidence.

Whether or not the prior act had been clearly proven depended on how the jury addressed K.A.'s credibility. Determining credibility is in the province of the jury, so admitting the evidence would allow the jury to do its job. As already established, K.A.'s testimony is highly probative of whether Longbine also committed offenses against P.H. The material fact that the evidence was being offered to prove—that Longbine had a propensity to commit sex offenses—was seriously disputed. "The more seriously disputed the material fact is, the more heavily this factor weighs in favor of admitting the evidence." *State v. Dearman*, No. 110,798, 2014 WL 3397185, at *7 (Kan. App. 2014) (unpublished opinion). And, as the district court noted, it would be difficult for the State to find less prejudicial evidence.

14

We find that here the probative dangers were not severe enough to warrant reversal. It is unlikely that the evidence contributed to an improper jury verdict because the jury had the power to determine that K.A.'s testimony was not credible. K.A.'s testimony also would not distract from the issues at trial because the testimony of what happened to K.A. is very similar to the testimony of what happened to P.H. Several recent cases support our conclusion.

In *State v. Moore*, No. 109,787, 2014 WL 4231237 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1018 (2015), the Court of Appeals faced a similar set of facts as the ones in this case. There, the victim, N.M.K., was awoken by a flash of light when he was staying at the defendant Moore's house in May 2010. Shortly after drifting back to sleep, N.M.K. felt someone tap his genital area through his clothing. That incident reminded N.M.K. of an incident at Moore's house in December 2009 when he woke up after feeling someone touching his penis area. That night, N.M.K. had seen Moore touching him, but Moore told N.M.K. that he was just looking for the television remote. At trial, the district court allowed the State to introduce evidence that Moore had attempted to touch other teenage boys at two youth retreats. Four boys testified to events similar to N.M.K.'s story—that they had woken up to light from a flashlight and that Moore had attempted to touch some of the campers' genital areas. Some of the incidents had been reported to the police, but no charges were ever filed. The jury convicted Moore of the May 2010 incident, but acquitted him of charges related to the December 2009 incident.

Moore appealed, arguing that the campers' testimony was unduly prejudicial. The Court of Appeals acknowledged that "most of the evidence presented by the State against a criminal defendant at trial will be prejudicial to the defendant; the balancing test is only intended to guard against *undue* prejudice." 2014 WL 4231237, at *13. "Undue prejudice includes the likelihood that the evidence will contribute to an improperly based jury verdict or distract from the central issues at trial." 2014 WL 4231237, at *13. The court

15

highlighted the fact that, despite hearing the boys' testimony, the jury still acquitted Moore on the charges related to the December 2009 incident. The court determined that the admission of the evidence did not lead to undue prejudice. 2014 WL 4231237, at *13.

Longbine's case is similar to Moore's. In both cases, the State presented testimony regarding uncharged but substantially similar incidents. Like Moore, Longbine was not convicted of all charges. The fact that the jury did not convict Longbine indicates that K.A.'s testimony did not improperly influence the jury verdict.

*Prine*, 297 Kan. 460, is also factually analogous to Longbine's case. In *Prine*, defendant John Prine, argued that the district court "erred by admitting evidence of Prine's sexual abuse of two victims other than the one making the allegations underlying" the case. 297 Kan. at 461. There the victim, a 6-year-old girl, alleged that Prine touched her vagina with his fingers and tongue. In addition to eliciting the victim's testimony, the State also introduced testimony from Prine's daughter, S.M., and his younger sister, J.S. S.M said that Prine would "place her on top of his bare body and she would be naked from the waist down and she could feel his penis on her vagina." 297 Kan. at 462. J.S. said that Prine would put his fingers and tongue on her vagina and also that Prine made her have oral sex with him. The Kansas Supreme Court held that it was error for the State to use the evidence to show intent, absence of mistake or accident, and plan. 297 Kan. 460, Syl. ¶ 5. But, the error was harmless because the evidence was admissible as propensity evidence under K.S.A. 2009 Supp. 60-455(d). The court stated reversal was not required "[b]ecause we have no doubt that, on any third trial of Prine, the evidence of his abuse of S.M. and J.S. would again come before the jury as propensity evidence [citation omitted] and that its probative value would be deemed more weighty than its threat of undue prejudice . . . ." 297 Kan. at 480.

The *Prine* court had no trouble concluding that the probative value of testimony from other victims outweighed any prejudicial effect. The same situation exists here.

16

Based on the caselaw and an analysis of the balancing test factors, a reasonable person could come to the same conclusion as the district court. Thus, the district court did not abuse its discretion in allowing K.A. to testify.

*The prosecutor's closing argument did not constitute error.*

During the first trial, the State moved to admit several pictures of P.H. Longbine objected on the basis of relevance. The State argued that the photos were relevant to show the discrepancy in size between P.H. and Longbine. The district court allowed one photo to be admitted on the basis that it was "relevant and probative just for comparison sake to the size of the defendant." At the second trial, the State again moved to admit four pictures of P.H to show P.H.'s size and appearance. Longbine objected to the admission of all four photos, arguing that admitting four photos would be redundant. However, Longbine did not object to the admission of only one photo, specifically Exhibit 15. Exhibit 15 portrays P.H. posing in a teeball uniform as a 6-year-old. The district court allowed Exhibit 15 to be admitted.

At the end of its closing argument, the State portrayed the photo of P.H. and made the following comment:

> "Is this a 20-year conspiracy? For the child, that's the admitted photo of what [P.H.] looked like during the time frames in question. For [P.H.] at seven and eight, and then at 11, and then when you have to see her at the age of 15, do you find that [K.A.] has put this child up to say what she said in the interview with [Deputy Schultz], to say what she said to [the youth group leader], to say what she said to [the school counselor], to say to [P.H.'s friends], to say what she said to [the forensic interviewer], do you find that is all a fabricated conspiracy beginning with a child like that?"

Longbine did not object when the State showed P.H.'s photo and made its closing argument statements.

17

The Kansas Supreme Court established a new framework for reviewing the behavior of prosecutors in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). However, *Sherman* was decided after the parties in this case briefed the issues for appeal. The Kansas Supreme Court has applied the old framework to cases that were briefed before *Sherman*, but in doing so the court has noted that the same result would have been reached had it applied the *Sherman* framework. See *State v. Netherland*, 305 Kan. 167, 379 P.3d 1117, 1126 (2016) ("We will therefore apply our old prosecutorial misconduct framework to the claim advanced here, noting only that application of the new framework would not make a difference in the outcome."); *Kleypas*, 382 P.3d at 435 ("[W]e will discuss the analysis under both *Tosh* and *Sherman*. Kleypas does not establish reversible error under either.").

Appellate review of an allegation of prosecutorial error requires a two-step analysis. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. This analysis is the same under both the old and new frameworks. 382 P.3d at 435.

If there was prosecutorial error, then the second step of the analysis under the old framework is determining whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. In making this determination, the "appellate court considers three factors:  (1) whether the misconduct was gross and flagrant, (2) whether it was motivated by prosecutorial ill will, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." 382 P.3d at 435. The three factor test is not used under the new *Sherman* framework. Instead, "the prejudice analysis will focus on whether the error prejudiced the defendant's due process rights to a fair trial; if a due process violation occurs, prejudice will be assessed by applying the *Chapman* constitutional error standard." 382 P.3d at 436.

18

Like in *Kleypas* and *Netherland*, no reversible error can be established here under either the new or the old framework.

The first step of appellate review is determining whether there was prosecutorial error. The State was allowed to use the photo to compare P.H.'s size to Longbine's size. When the State displayed the photo during closing arguments the State's attorney said "that's the admitted photo of what [P.H.] looked like during the time frames in question." Even though the State did ask the jury to consider whether a child of that age and size would fabricate this story that was the essence of the case—whether the jury believed P.H.—and we cannot conclude that this was an unlawful appeal to sympathy. The State was using the evidence for the exact reason it was admitted, to show P.H.'s size and appearance during the time frame in question.

However, even if the prosecutor did err in the method in which it argued to the jury, the error is harmless under both the old and new frameworks of appellate review. The prosecutor's conduct was not gross or flagrant. "[F]actors determining gross and flagrant conduct include repeated comments, emphasis on improper point, planned or calculated statements, violation of a well-established rule, and violation of a rule designed to protect a constitutional right." *State v. De La Torre*, 300 Kan. 591, 614, 331 P.3d 815 (2014) (citing *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 [2010]). The prosecutor displayed the photo only for a short time and did not emphasize it. The fact that Longbine did not object also suggests that the prosecutor's conduct was not gross or flagrant—one would expect an attorney to object when a well-established rule is violated. See *State v. Robinson*, 303 Kan. 11, 308-09, 363 P.3d 875 (2015) (noting that improper remark "was such that it drew no objection from the defense" and later concluding the comment was not gross and flagrant), *cert. denied* 137 S. Ct. 164 (2016). Displaying the photo did not seem motivated by prosecutorial ill will. A prosecutor's ill will is often "reflected through deliberate and repeated misconduct or indifference to court's rulings." *State v. Madkins*, 42 Kan. App. 2d 955, 961, 219 P.3d 831 (2009). Here,

19

the prosecutor's conduct may have been deliberate, but it was not repeated. And, it is possible that the prosecutor thought she was acting within the scope of the court's permission because the court allowed the State to admit the photo into evidence.

Displaying the photo during closing arguments likely bore little weight in the minds of the jurors. First, the jurors had already seen the photo when the State originally entered it into evidence. So, the photo was not new to the jury when it was displayed during the closing argument. Second, during the trial the jury watched a video of a 10-year-old P.H. telling her story to Detective Schultz. In this video, P.H. becomes emotional and Detective Schultz had to leave to get tissues for P.H. It is unlikely that this photo bore significant weight in the jurors' minds relative to that video. Third, the jury was instructed that it "must consider this case without favoritism or sympathy for or against either party." It is generally presumed that jurors follow the district court's instructions. *State v. Peppers*, 294 Kan. 377, 392, 276 P.3d 148 (2012). Finally, the prosecutor did not exhibit ill will or gross and flagrant conduct and Longbine did not object to the prosecutor's use of the photo. Therefore, under the old prosecutorial error framework, no reversible error occurred.

Step two of the new framework of appellate review of prosecutorial error requires application of the *Chapman* constitutional error test. That test requires the party benefitting from the error to persuade the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, prove[] there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]). The same reasons that support the conclusion that the photo bore little weight in the minds of the jurors also supports the conclusion that the error did not affect the outcome of the trial. Therefore, we find there was no prosecutorial error warranting reversal.

20

*There was no cumulative error.*

Longbine's final argument is that cumulative errors denied him a fair trial. However, "where there was no error there can be no cumulative error." *State v. Acevedo*, 49 Kan. App. 2d 655, 656, 315 P.3d 261 (2013). Because we find that there was no error in this case, cumulative errors do not require reversal.

The judgment of the district court is affirmed.

Affirmed.