(305 P.3d 676)
No. 107,829

STATE OF KANSAS, *Appellee*, v. SIRMARK K. BREWER, *Appellant*.

Opinion filed July 12, 2013.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, for appellant.

*Jeffery Ebel*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

BEFORE MALONE, C.J., LEBEN and ARNOLD-BURGER, JJ.

MALONE, C.J.: Sirmark K. Brewer appeals his convictions of multiple drug-related offenses and a traffic offense. Brewer claims the district court erred in denying his motion to suppress evidence of the drugs found in the vehicle he was driving. He also claims the district court erred in denying his motion for substitute counsel during his jury trial. Finding no reversible error, we affirm the district court's judgment.

Brewer was charged with multiple drug-related and traffic offenses stemming from an encounter with law enforcement during the early morning hours of February 18, 2010. According to the charging affidavit, a police officer noticed two potential traffic offenses related to the vehicle that Brewer was driving. The officer followed the vehicle for a few minutes until it stopped in a driveway. The officer made contact with Brewer and ultimately conducted an exterior air sniff of the vehicle using a K-9 dog that was riding in the officer's vehicle. The K-9 exhibited behavior changes indicating an alert to the odor of drugs. During a subsequent search

of the interior of the vehicle, the officer found substances that appeared to be marijuana and methamphetamine.

Brewer filed a motion to suppress the evidence of the drugs found in the vehicle. The district court held an evidentiary hearing on the motion. At the hearing, Officer Aaron Carswell testified that he noticed that the vehicle Brewer was driving had very dark tinted windows and that the temporary license tag appeared to have been altered with some markings on the tag. Based on conversations with other law enforcement officers, Carswell was informed that Brewer might be driving the vehicle and that Brewer and the vehicle might be associated with drug activity. Carswell followed the vehicle for six or seven blocks. When the vehicle pulled into the driveway of a residence, Carswell stopped at the end of the driveway and activated his emergency lights.

Brewer quickly exited the vehicle and began walking toward the front door of the residence, at which point Carswell stopped him and asked him for his driver's license as well as the registration and proof of insurance for the vehicle. Brewer handed Carswell a Texas driver's license. According to Carswell, Brewer was acting nervous and did not appear to want anything to do with the vehicle. Brewer was hesitant to return to the vehicle, and Carswell had to ask several times for Brewer to retrieve his papers from the vehicle. When Brewer finally did so, he opened the passenger door, reached inside the glove box, and quickly closed the passenger door without ever sitting inside the vehicle, which Carswell thought was suspicious.

Carswell called dispatch to check the status of Brewer's Texas driver's license, which was confirmed to be valid. Because Carswell was reasonably certain that Brewer also had a Kansas driver's license that had been suspended, he began to check that status as well. Meanwhile, a second police officer arrived, and Carswell advised him of the situation. When informed by dispatch that Brewer's Kansas driver's license was in fact suspended, Carswell asked the other officer to write a traffic citation.

While the other officer was writing a citation, Carswell used a K-9 to conduct an exterior air sniff of the vehicle. The K-9 sniff was initiated about 10 to 12 minutes after the vehicle stop. Carswell

testified that the K-9 was certified annually and underwent ongoing monthly training. He estimated that the K-9's false positive rate was about 10 percent. Carswell and the K-9 made several passes around the vehicle, and each time the K-9 stopped at the passenger door and made behavior changes indicating an alert to the odor of drugs. Carswell asked Brewer for the keys to the vehicle, which Brewer had locked when he exited. Instead of giving Carswell the keys, Brewer walked to the front door of the residence and put the keys inside. Carswell contacted Brewer's girlfriend, who was inside the residence, and eventually persuaded her to hand over the keys. Carswell searched the vehicle and found a large bag in the center console, which contained several smaller bags of marijuana and a small bag of what appeared to be methamphetamine.

The district court denied Brewer's motion to suppress the evidence. The district court found that Carswell had reasonable suspicion to conduct a traffic stop based on his observations that the window tint appeared to be excessive and that the temporary license tag appeared to be altered. The district court further found that Carswell had probable cause to conduct a warrantless vehicle search based on the K-9 alert, Carswell's information from other law enforcement officers that Brewer and the vehicle might be involved in drug activity, and Carswell's observations of Brewer's nervous behavior.

Brewer subsequently filed a motion to reconsider the denial of his motion to suppress. The motion to reconsider alleged that the State failed to provide documentation that the K-9 was certified at the time of the exterior air sniff and that the K-9's training records and reports indicated a much higher rate of false positives than the 10 percent estimate given by Carswell at the hearing on the motion to suppress.

The district court held an evidentiary hearing on the motion to reconsider. At the outset, Brewer acknowledged that he had received documentation that the K-9 was recertified in October 2009. But Brewer stated that he had not received documentation that the K-9 had undergone monthly training between July 2009 and February 2010, except for a single training session on February 9, 2010. Carswell testified that the monthly training was a police

department policy rather than a requirement for certification. He did not know why there were no training records for that time period but testified that he and the K-9 consistently did the training.

With respect to the K-9's false positive rate, Carswell stated he was not surprised the records showed that the K-9 indicated the odor of drugs on approximately 35 to 37 percent of deployments— *i.e.*, real world police use as opposed to controlled training situations—in which drugs were not actually found. But Carswell testified that those numbers were misleading because even when a K-9 indicates the odor of drugs and no drugs are found, it is possible that the K-9 detected the residual odor of drugs that were recently removed from the vehicle or vicinity.

After hearing the evidence, the district court denied Brewer's motion to reconsider. The district court found that the K-9 was properly certified at the time of the exterior air sniff of the vehicle. The district court further found that based on Carswell's testimony, Carswell and the K-9 underwent regular training together.

At trial, the State presented the testimony of Carswell, the second police officer who responded to the scene, two other police officers involved in the processing and handling of evidence collected, and a chemist who tested the substances sent to the Kansas Bureau of Investigation (KBI) laboratory. At the close of the State's evidence, Brewer's counsel made an oral motion to withdraw as counsel, stating that "Mr. Brewer has expressed quite a bit of dissatisfaction with my performance on the trial so far today." Counsel elaborated that there was "a disagreement with respect to questions I'm asking and how I'm proceeding."

The district court then questioned Brewer directly about the reasons for his dissatisfaction. Brewer stated that he believed Carswell was lying about what happened on the morning in question and that his counsel "[kept] blowing [him] off" when he asked him to point out inconsistencies in Carswell's testimony. Brewer asked for different counsel. The district court told Brewer that he could either discharge his counsel and represent himself for the rest of the trial or he could continue with his present counsel:

"[W]e are in the middle of a trial. At this point the State has rested and you have had an attorney who appears to the court, anyway, to be prepared and representing you. And, you know, ultimately the questions that are asked are up to him after consulting with you about the case and preparing trial strategy. But, ultimately, since you chose to have an attorney, the actual questions that are to be asked are up to him. He is the one that is trained in the law, so, those questions—what questions are asked are up to him.

"So, at this point, unless you want to represent yourself and discharge your attorney, you know, we are going to continue."

Brewer elected to continue with his present counsel. The defense presented the testimony of the finance manager of an automobile sales group, who stated that the vehicle in question was sold on January 21, 2010, to a person other than Brewer. The vehicle owner's given address was the same address as the residence where the vehicle search occurred. The defense also presented the testimony of a forensic scientist, who testified that he found one fingerprint on the plastic bags sent to the KBI laboratory. The fingerprint did not belong to Brewer, but the fingerprint was a possible match with another person in the database. Brewer did not testify on his own behalf. During closing argument, defense counsel emphasized that the vehicle did not belong to Brewer, that no drugs were found on Brewer's person, and that the fingerprint on the plastic bag did not belong to Brewer.

The jury found Brewer guilty of multiple drug-related offenses and driving while suspended. The district court sentenced Brewer to a controlling term of 41 months' imprisonment followed by 24 months' postrelease supervision. Brewer timely appealed his convictions.

## MOTION TO SUPPRESS

Brewer claims the district court erred in denying his motion to suppress the evidence. He contends that Carswell lacked reasonable suspicion to conduct a traffic stop and lacked probable cause to conduct a warrantless vehicle search. He specifically argues that the K-9 alert was unreliable because the K-9 had a 37 percent false positive rate and because the State failed to show that the K-9 had undergone the required continued training; that Carswell's knowledge of Brewer's possible drug activities was unreliable; and that

Brewer's nervousness could not support a finding of probable cause. The State argues that Carswell had reasonable suspicion to conduct a traffic stop based on his observations that the window tint appeared to be excessive and that the temporary license tag appeared to be altered. The State also contends that Carswell had probable cause under the totality of the circumstances to conduct a warrantless vehicle search.

An appellate court uses a bifurcated standard to review a district court's decision on a motion to suppress. Without reweighing the evidence, the appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. *State v. Sanchez-Loredo*, 294 Kan. 50, 54, 272 P.3d 34 (2012). Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). The district court's ultimate legal conclusion is reviewed de novo. *Sanchez-Loredo*, 294 Kan. at 54.

The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides identical protection to the Fourth Amendment. *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007).

*Reasonable suspicion to conduct traffic stop*

A traffic stop is a seizure under the purview of the Fourth Amendment. In order to stop a vehicle, an officer must have articulable facts sufficient to constitute reasonable suspicion that the operator of the vehicle is committing, has committed, or is about to commit a crime. See K.S.A. 22-2402(1); *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual. *Moore*, 283 Kan. at 349-50.

Here, the district court found that Carswell had reasonable suspicion to make the traffic stop based on his articulated observations regarding the excessive window tint and the altered temporary license tag, both of which are traffic violations. See K.S.A. 8-1749a

(excessive window tint); K.S.A. 2009 Supp. 8-142 *Second* (altered tag). Brewer does not contest the factual basis for Carswell's observations but argues that the observations did not rise to the level of reasonable suspicion given that Carswell waited until Brewer pulled into a driveway to make the traffic stop. This argument fails because either apparent traffic violation provided an objectively valid reason for Carswell to make the traffic stop, even if the stop was pretextual. Carswell did not allow a significant amount of time to pass between observing the traffic violations and the ultimate stop. See *State v. Schneider*, 32 Kan. App. 2d 258, 262-63, 80 P.3d 1184 (2003) (court questioned propriety of pretextual traffic stop where stop occurred 15 miles after officer observed infraction). Thus, the district court did not err in finding that the stop was supported by reasonable suspicion.

*Probable cause to conduct warrantless vehicle search*

A warrantless search by a police officer is per se unreasonable under the Fourth Amendment unless the State can fit the search within one of the recognized exceptions to the warrant requirement, one of which is probable cause plus exigent circumstances. Probable cause to search a vehicle can be established if the totality of the circumstances indicates there is a fair probability that the vehicle contains contraband or evidence of a crime. *Sanchez-Loredo*, 294 Kan. at 55. The mobility of the vehicle provides the exigent circumstances without the necessity of proving anything more. If a vehicle is readily mobile and probable cause exists to believe the vehicle contains contraband or evidence of a crime, the Fourth Amendment does not require a warrant for police to search the vehicle. 294 Kan. 55, Syl. ¶ 4.

Here, the district court found that Carswell had probable cause to conduct a warrantless vehicle search based on three factors: (1) the K-9 alert; (2) Carswell's information from other law enforcement officers that Brewer and the vehicle might be involved in drug activity; and (3) Carswell's observations of Brewer's unusual and nervous behavior. We will examine each of these factors in turn.

First, with respect to the K-9 alert, Brewer acknowledges that a K-9 alert may supply the probable cause necessary to search a vehicle as long as there is some evidence that the K-9's behavior reliably indicates the likely presence of a controlled substance. See *State v. Barker*, 252 Kan. 949, 959-60, 850 P.2d 885 (1993). But Brewer argues that the K-9 alert in his case did not constitute probable cause because the State failed to establish that the K-9 alert was reliable. Specifically, Brewer argues that the K-9 had a high false positive rate and the State failed to show that the K-9 had undergone the required continued training.

There is no dispute that the K-9 was properly certified at the time of the exterior air sniff in this case. Furthermore, the district court's factual finding that Carswell and the K-9 underwent regular monthly training together during the relevant timeframe is supported by substantial competent evidence where Carswell testified that they underwent regular training and where documentation showed that they had completed a training session just 9 days before the exterior air sniff. The evidence of the K-9's certification and regular training provided the necessary foundation to establish that the dog's "alert" provided probable cause to search the vehicle. *Barker*, 252 Kan. at 960. See *Florida v. Harris*, 568 U.S. ___, 133 S. Ct. 1050, 1057-58, 185 L. Ed. 2d 61 (2013) (when training and testing records supported dog's reliability in detecting drugs, and defendant failed to undermine that evidence, officer had probable cause to search defendant's truck).

As to the K-9's false positive rate of approximately 35 to 37 percent, Brewer fails to cite any caselaw supporting the proposition that this rate is unusually high or indicates that a K-9 is not reliable. Brewer also ignores the uncontroverted evidence that the K-9's false positive rate was based on its real world deployment. Although it appears that no Kansas courts have explicitly addressed the issue, courts in a majority of jurisdictions either have minimized or rejected real world deployment records as material evidence of a K-9's reliability, in part because of a K-9's ability to detect residual odor even where drugs are not found. See, *e.g., State v. Nguyen*, 157 Ohio App. 3d 482, 488-99, 811 N.E.2d 1180 (collecting state and federal cases addressing materiality of real world deployment

records), *rev. denied* 103 Ohio St. 3d 1480 (2004). In *United States v. Salgado*, No. CR. 12-30088(01)-RAL, 2013 WL 230217, at *3-4 (D. S.D. 2013), the court stated:

"A controlled environment provides the most effective means of determining whether a dog has undergone the training necessary to reliably indicate to drug odor. Those involved in evaluation exercises know where contraband is hidden. By correlating a dog's indications and non-indications to known locations, the dog's reliability in detecting drug odors can be verifiably gauged.

"In the real world arena, the situation is markedly different, and it is not possible to assess a dog's reliability in the same way. If a dog does not indicate to a car that in reality contains drugs, the failure may never be discovered because the car was never searched. On the other hand, if a dog indicates to a vehicle in which contraband is not ultimately found, it is impossible to know whether the dog detected to a residual odor of a drug, a correct indication, but not one that resulted in the recovery of drug evidence or whether the dog indicated without there being any drugs at all.

. . . .

"For these reasons, 'unconfirmed' real world indications do not necessarily detract from a drug dog's reliability. For instance, field records may indicate that 55 percent of a particular dog's indications were confirmed in some manner by the recovery of drugs or by a car occupant's admission that drugs had been in the vehicle. But what about the remaining 45 percent of the indications? Were they accurate too? Most, if not all, of them may have been and their existence does not necessarily undermine the dog's reliability. By contrast, if the dog has a very low success rate in a controlled training or certification setting, in which all other explanations for a non-seizure indication can be eliminated, then the dog's lack of reliability can be more precisely determined."

We side with the majority of courts that have found that it is immaterial to use a real world false positive rate to challenge a K-9's reliability because a K-9 can detect residual odor even after drugs have been removed from a vehicle. Based on the evidence presented in Brewer's case that the K-9 was properly certified at the time of the exterior air sniff and that the K-9 had undergone the required continued training, we conclude the district court properly relied on the K-9 alert in finding that Carswell had probable cause to conduct a warrantless vehicle search.

The second factor relied on by the district court was its finding that Carswell had information from other law enforcement officers that Brewer and the vehicle might be involved in drug activity. Kansas caselaw suggests that the collective knowledge of law en-

forcement may support probable cause to search where that knowledge is based upon reasonably reliable information relayed by a reliable chain of communication. See *State v. Ibarra*, 282 Kan. 530, 544-46, 147 P.3d 842 (2006) (relying on *State v. Clark,* 218 Kan. 726, 731-32, 544 P.2d 1372, *cert. denied* 426 U.S. 939 [1976]). But as Brewer points out, Carswell was unable to name the law enforcement officers from whom he received information that Brewer and the vehicle might be involved in drug activity. Also, there is nothing in the record to indicate the source or reliability of the information held by those unnamed officers. In these circumstances, there were insufficient facts to support a finding that Carswell had reasonably reliable information that Brewer and the vehicle were involved in drug activity. Thus, the district court erred in finding that such information supported probable cause to conduct a warrantless vehicle search.

The third factor relied on by the district court was its finding that Carswell personally observed Brewer's unusual and nervous behavior. Brewer notes that it is not uncommon for most citizens, whether innocent or guilty, to exhibit signs of nervousness when stopped by police. He argues that courts should be wary of claims that nervousness indicates complicity in criminal activity. Nonetheless, our Supreme Court has found that while nervousness alone is not enough to form reasonable suspicion (and consequently, insufficient to support the more rigorous standard of probable cause), nervousness may support an inference of criminal activity when combined with other factors. *Moore*, 283 Kan. at 355-60 (relying on *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 [1998]). As the district court noted, Carswell testified to Brewer's unusual behavior apart from ordinary nervousness, *i.e.*, his quick exit from the vehicle and reluctance to return to or have anything to do with the vehicle. The district court's finding that Carswell personally observed Brewer's unusual and nervous behavior is supported by substantial competent evidence, and this factor supports the district court's legal conclusion that Carswell had probable cause to conduct a warrantless vehicle search.

Whether probable cause exists to search a vehicle is determined by examining the totality of the circumstances. *Sanchez-Loredo*,

294 Kan. at 55. As discussed above, a reliable K-9 alert may alone supply the probable cause necessary to conduct a warrantless vehicle search. The K-9 alert in this case, especially when coupled with Brewer's unusual and nervous behavior, indicated a fair probability that the vehicle contained drugs. The district court's factual findings in this regard were supported by substantial competent evidence and supported its ultimate legal conclusion that Carswell had probable cause to conduct a warrantless vehicle search. Thus, we conclude the district court did not err in denying Brewer's motion to suppress the evidence.

## MOTION FOR SUBSTITUTE COUNSEL

Next, Brewer claims the district court erred in denying his motion for substitute counsel during the middle of his jury trial. Brewer argues that the district court improperly focused on whether Brewer wanted to proceed pro se rather than inquiring about whether he was justifiably dissatisfied with his trial counsel. The State argues that the district court allowed Brewer to explain his grievances with counsel and, based on Brewer's statements, appropriately exercised its discretion in denying Brewer's motion.

An indigent criminal defendant has a right to be represented by counsel but does not have the right to be represented by a particular counsel. The decision to appoint substitute counsel depends on the circumstances of the case, and the district court possesses broad discretion in determining whether to appoint substitute counsel. An appellate court reviews the district court's decision on a motion for substitute counsel for abuse of discretion. *State v. Sappington*, 285 Kan. 158, Syl. ¶ 4, 169 P.3d 1096 (2007). Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. *State v. Bryant*, 285 Kan. 970, 986-87,

179 P.3d 1122 (2008). But not all disagreements between a defendant and his or her counsel constitute irreconcilable conflicts or lead to complete breakdowns in communication. Ultimately, as long as the district court has a reasonable basis for believing that the relationship has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel. *Bryant*, 285 Kan. at 986-87. Before determining whether to appoint substitute counsel, the district court must make some inquiry into the defendant's complaints. *State v. Bogguess*, 293 Kan. 743, 754, 268 P.3d 481 (2012).

Brewer argues on appeal that the district court failed to make an adequate inquiry into his complaints and then decided his motion for substitute counsel without explicitly applying or making findings under the "justifiable dissatisfaction" test. But it is apparent from the record that the district court heard from Brewer's counsel and then gave Brewer ample opportunity to explain his dissatisfaction, which Brewer repeatedly stated was because counsel was not asking certain questions of the State's witnesses on cross-examination. Although the district court did not explicitly deny Brewer's motion in terms of "justifiable dissatisfaction," it is evident that the district court found that the reasons Brewer stated were inadequate to warrant the appointment of substitute counsel. See *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006) (in the absence of an objection, omissions in findings will not be considered on appeal).

As to whether the reasons articulated by Brewer constituted justifiable dissatisfaction, the district court noted that strategic and tactical decisions, including whether and how to conduct cross-examination, are within the exclusive province of counsel after consultation with his or her client. *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972). Consultation does not mean that counsel must ask the client's permission before making strategic decisions but only implies a general discussion between counsel and client. *State v. Bafford*, 255 Kan. 888, 895, 879 P.2d 613 (1994).

Here, Brewer acknowledged that he had met with counsel to discuss trial strategy. He cited no issues with his counsel, other

than the cross-examination of Carswell, to suggest a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication. Under these circumstances, Brewer failed to show justifiable dissatisfaction with his trial counsel. We conclude the district court did not err in denying Brewer's motion for substitute counsel.

Affirmed.