No. 122,735

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHELBY R. FRIAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

"False pretense" as used in the mistreatment of an elder person statute, K.S.A. 2014 Supp. 21-5417(b)(1)(A), means a representation of a fact that is untrue, calculated to mislead, and intended to induce the person to whom it is made to part with something of value.

2.

The mistreatment of an elder person statute restricts the affirmative defense that money was given as a gift, precluding a generic gift instruction. No affirmative defense of a gift is legally appropriate under K.S.A. 2014 Supp. 21-5417(e) unless a pattern, court approval, or reasonableness of the gift-giving is shown.

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Opinion filed November 5, 2021. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

1

Before GARDNER, P.J., HILL and HURST, JJ.

GARDNER, J.: A jury convicted Shelby R. Frias of mistreatment of an elderly person for financial crimes against her stepmother, Yvonne Emery, between May 2015 and March 2017. After her trial, Frias' attorney moved for a new trial or judgment of acquittal, and Frias moved pro se for a new trial and to appoint new counsel. The district court denied both motions then sentenced Frias to 32 months' imprisonment followed by 24 months' postrelease supervision, and imposed restitution in the amount of $54,853.15.

Frias appeals, arguing the jury lacked sufficient evidence to find her guilty beyond a reasonable doubt of mistreating an elderly person. But the record shows sufficient evidence, viewed in the light most favorable to the prosecution, for a rational fact-finder to find Frias guilty beyond a reasonable doubt. Frias also argues the district court erred by failing to give an affirmative defense instruction. Yet the affirmative defense instruction was neither legally nor factually appropriate. Frias argues that the district court abused its discretion in denying her motion for substitute counsel, yet we are unpersuaded. And finally, she argues the district court erred by imposing restitution without an accompanying payment plan. But the district court did order a restitution payment plan at sentencing. For all these reasons, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Yvonne Emery once worked as the director of human resources and civilian personnel on McConnell Air Force Base. But as she aged, her health declined. She lived at an assisted living facility for 10 years, but after a hospital stay, she moved to the Legacy care home in Wichita in May or June 2015. About two years later, an investigation revealed that Emery's bill at Legacy had been mostly unpaid since 2015, putting her in arrears of around $77,000.

2

After an investigation, the State charged Frias with mistreating an elder person, a level 5 person felony under K.S.A. 2014 Supp. 21-5417(b)(1)(A) and (d)(1)(D), and theft under K.S.A. 2014 Supp. 21-5801(a)(1). Frias entered a plea agreement but later moved to withdraw her plea, and the district court allowed her to do so. At the jury trial, the State dismissed the theft charge and tried only the charge of mistreatment of an elder person.

Frias testified that she had spent Emery's money only as Emery wanted her to. She and her sister testified on her behalf. To the contrary, the State's witnesses testified that Emery, who had passed away before trial, had told Frias to take care of Emery's bills first, and then to ask permission before spending more of her money. Both theories were supported by evidence.

The jury convicted Frias of financial mistreatment of an elder person by false pretenses. Frias' attorney, Quentin Pittman, then moved for a new trial or a judgment of acquittal. Frias sent a letter to the district court before sentencing alleging deficient representation by Pittman and asking for new counsel.

The district court held a motions hearing just before sentencing. The district court, which had read Frias' letter, asked why she wanted new counsel. Frias responded at length but without specificity. The district court then asked Pittman whether he wanted to respond and Pittman replied only that he believed he did not need a client's permission to file appropriate motions. Pittman did not seek to withdraw. The district court denied Frias' request for new counsel because it could not find a "legal basis" to order new counsel.

The district court then heard Pittman's arguments on the motion for a new trial or judgment of acquittal and denied the motion, as well as Frias' pro se motion for a new trial.

Sentencing followed. The State argued that because of Emery's vulnerability and the purpose of the mistreatment of an elder person statute, Frias should serve the presumptive jail sentence. Defense counsel argued that the district court should impose probation because Frias was a first-time offender who posed no risk to the community and had no history of substance abuse. He also blamed Frias' acts on her ignorance, rather than her intentional behavior. Frias asked for probation so she could continue to work, support her children, maintain her home, and repay the State's requested restitution.

Because Frias refused to admit wrongdoing and offered no evidence supporting mitigating factors, the district court found it was bound to sentence her within the sentencing grid and could not depart to probation. The district court thus ordered Frias to serve 32 months in prison followed by 24 months' postrelease supervision. It also imposed restitution totaling $54,853.15.

Frias timely appeals.

## I.  DOES SUFFICIENT EVIDENCE SUPPORT THE VERDICT?

Frias first contends that the evidence was insufficient to show that she took Emery's financial resources through "false pretense," as the statute required.

When an appellant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether we are convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). We do not "'reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" 307 Kan. at 668 (quoting *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 [2014]). But if the insufficiency argument rests on questions of statutory interpretation, we exercise

4

unlimited review because statutory interpretation is a question of law. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be determined. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). An appellate court must first try to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Ayers*, 309 Kan. 162, 164, 432 P.3d 663 (2019).

K.S.A. 2014 Supp. 21-5417(b)(1)(A) defines the crime:

"(b) Mistreatment of an elder person is knowingly committing one or more of the following acts:

(1) Taking the personal property or financial resources of an elder person for the benefit of the defendant or another person by taking control, title, use or management of the personal property or financial resources of an elder person through:

(A) Undue influence, coercion, harassment, duress, deception, false representation, false pretense or without adequate consideration to such elder person."

The Legislature intended K.S.A. 2014 Supp. 21-5417 "to criminalize a wide range of ways to divert or take the financial resources of [an elder person] . . . ." *State v. Mayfield*, No. 121,552, 2021 WL 935715, at *2 (Kan. App.) (unpublished opinion), *rev. denied* 313 Kan. 1044 (2021). One of those ways is by using "false pretense."

*Analysis*

The parties do not dispute that Emery was an "elder person" within the protection of the statute. See K.S.A. 2014 Supp. 21-5417(g)(3). Nor do they dispute that Frias knowingly took and used Emery's financial resources for her own benefit. See K.S.A. 2014 Supp. 21-5417(b)(1). But Frias contends that she did not do so through "false

5

pretense," the sole means charged by the State and prohibited by statute. See K.S.A. 2014 Supp. 21-5417(b)(1)(A).

This statute does not define "false pretense." Nor did the district court define it for the jury. Frias argues that caselaw also lacks a definition for that term. Yet Frias cites the time-honored case of *State v. Handke*, 185 Kan. 38, 340 P.2d 877 (1959). That case referenced a wordy definition from 35 C.J.S. False Pretenses § 6, p. 644:

> "'Generally speaking, to constitute the crime of obtaining property by false pretenses there must be a false representation or statement of a past or existing fact, made by accused or someone instigated by him, with knowledge of its falsity and with intent to deceive and defraud, and adapted to deceive the person to whom it is made; and there must be, further, a reliance on such false representation or statement, an actual defrauding, and an obtaining of something of value by accused or someone in his behalf, without compensation to the person from whom it is obtained.'" 185 Kan. at 43.

*Handke* thus required a misrepresentation of a past or present fact—future events or promises were not sufficient. The *Handke* court found sufficient evidence of false pretenses when, to get a client's business, a man represented himself to be in a situation or business that he was not in. 185 Kan. at 43-44.

More recently, a panel of our court examined the current statute and its "false pretense" element. *Mayfield*, 2021 WL 935715, at *3. The panel found that "false pretense" requires a person's misleading or deceptive representation made to obtain something of value from another:

> "[A] false pretense entails a person's misleading or deceptive representation commonly made to carry out a wrongful act often bound up in obtaining money or some other thing of value from another. See 32 Am. Jur. 2d, False Pretenses § 10 ('The basis for a prosecution for obtaining money or property by false pretenses is a representation of a fact that is untrue, calculated to mislead, and intended to induce the person to whom it

6

is made to part with something of value.'); Black's Law Dictionary 1438 (11th ed. 2019) (defining 'pretense' as 'a way of behaving that is calculated to make people believe something untrue' and as 'an instance of dissembling')." 2021 WL 935715, at *3.

In *Mayfield*, the State contended that a conservator disregarded her oath to act in the ward's best interests by buying a pickup and, therefore, either never intended to honor her oath when she took it or deliberately abandoned the oath when she made the purchase. But the evidence failed to show that the conservator engaged in any false pretenses because she had made no untrue representations either when obtaining the ward's money or when using the ward's money to buy items for herself. The oath and its violation had played no causative part in the dissipation of the ward's money, including the purchase of the pickup. 2021 WL 935715 at *3. The *Mayfield* panel thus found that the conservator's act of writing checks drawn on her own account into which her ward's money had been deposited was insufficient to show false pretense.

Based on these scant authorities, we find that "false pretense," as used in this statute, means a representation of a fact that is untrue, calculated to mislead, and intended to induce the person to whom it is made to part with something of value. Beyond that, we do not limit the term. Such a representation may be overt or tacit, verbal or nonverbal.

Given those broad definitional parameters, we next examine the evidence. Frias' theory of defense was that she used Emery's money only as Emery directed her to. Frias testified that she "spen[t] the money as [Emery] instructed and allowed or whatever she told me to do, I did it, and whatever I asked, if she said okay, then I could do that." Emery had lost her purse and checks, so Frias found some of Emery's old checks and brought some in to use. She kept the bulk of the checks at her house because Emery did not want checks left at the facility. Frias would give some checks to Emery, and Emery would sign three or four of them at a time when her handwriting was good. Frias would take the signed checks, then write her own name as payee and fill in the amount when a

7

payment would come into Emery's bank, apparently from Emery's federal pension or Social Security. Frias knew Emery had been a "very high ranking civilian employee" at the air force base. Frias deposited these checks into her own account almost monthly, some ranging from $2,500 to $3,000. Frias said she used the money to buy things for Emery, to maintain Emery's house, and to buy things for herself or pay her personal expenses.

Frias was Emery's durable power of attorney for healthcare, but not for financial decisions, and Frias was not a signatory on Emery's account. Frias testified that she began handling Emery's money this way because they had no access to Emery's bank, which was on the air force base, and because it was convenient. Emery told her to handle her money that way until they could figure something else out since they could not get onto the base. Frias admitted that at the time, she was going through a tough time financially and needed help.

Frias testified that Emery, when she was competent, had told her not to pay Legacy's bills, perhaps because Emery expected to get Medicaid or thought Legacy would evict her. Frias did, however, pay several months of Legacy's bills when a question arose later about Emery's capacity, saying she did so in good faith because she knew those bills had not been paid. During Emery's two-year stay at Legacy, Frias paid Legacy's bills for four months—June through September 2016. Frias wrote, "Legacy at College Hill" or "long-term care" on the memo line because her sister, who was on the account with Emery, had asked her to.

Frias' sister testified that Emery was aware Frias was not paying her nursing home bills. Frias' sister testified that Emery had told Frias not to pay the facility bills because "she didn't want them paid until she figured [her Medicaid paperwork] out." Yet Emery apparently was not approved for Medicaid and remained personally responsible for paying her bill to College Hill.

The State showed that in a two-year period, Frias had Emery sign roughly 30 blank checks that Frias made payable to herself, enabling Frias to spend over $67,000 from Emery's account. Although Frias wrote in the memo line of the checks some variation of "long-term care" or "Legacy" or "College Hill," Frias' payment to that facility totaled only around $12,000.

Several witnesses spoke with Emery about potential abuse. Terri Livingston, a previous College Hill nurse and social service designee, talked to Emery about the fact that her bills from Legacy were unpaid. Emery had no idea where her money was going, so Livingston showed Emery her bank records. Once Emery learned how much money Frias had taken from her account, she was upset. Emery told Livingston that she wanted her rent at Legacy to be paid. Emery, with Livingston's help, promptly sent the bank a letter telling them to freeze all withdrawals from her account. Livingston called Frias more than once, thinking she was authorized to handle Emery's finances, but Frias never returned her calls.

Kathleen Wooderson, a social worker for the Adult Protective Services Division of the Department for Children and Families, was assigned to Emery in the spring of 2017. Wooderson's job included investigating possible fiduciary abuse of vulnerable adults. She said Emery was surprised about the investigation into her finances and told her that she had not had money for a long time. Wooderson reviewed Emery's bills, her durable powers of attorney, and her bank statements. Frias was Emery's power of attorney for health care decisions, but Emery told Wooderson that Frias was supposed to manage Emery's money as well. And Frias had signed the contract between Legacy and Emery on Emery's behalf, agreeing to "pay all fees and charges not covered by public aid funds, or insurance benefits, when they are billed."

Emery told Wooderson that she had lost her purse, that Frias managed her money, and that Frias had never brought her anything to the nursing home. When Wooderson

9

reviewed Emery's bank records she saw that Frias had written checks to herself on Emery's account, but she saw no record that Legacy had been paid—its bill was over $77,000. Wooderson found many checks that Emery had signed with memo lines indicating Legacy or College Hill, but none was made payable to the care home. Rather, all were made payable to Frias. The checks from Emery to Frias as payee exceeded $67,000.

Wooderson sent Frias a contact letter asking Frias to call her. When Frias did not do so, Wooderson called Frias and left a voicemail to make an appointment to interview her. Frias then called Wooderson, and they set up an appointment, but Frias later called and canceled it. They rescheduled the interview, but Frias never showed up. Wooderson reported the matter to the police.

Andrea Riedel, a financial crimes investigator for the Sedgwick County District Attorney's Office, then took the case. She said Emery was surprised that her bills were not being paid. Emery told her that Frias was supposed to be paying Emery's bills first but was allowed to use her money after she paid them. Emery told Riedel at their first meeting that "her number one priority was [paying Legacy] and that [Frias] was not allowed to use her money without first asking her. She was allowed to use it if she asked her, but only after her bills were paid." During their second meeting, Riedel showed Emery copies of checks that Frias had written on Emery's account, and Emery responded that she would not allow Frias to transfer that amount of money to herself. Most of the money going into Frias' account was coming out of Emery's account. Riedel testified that a previous social worker had told her that the only time Frias had paid Legacy was when the facility had pressured her to do so. Riedel discovered that of the approximately $67,338 Frias took from Emery's account in a two-year period, only $12,485 had gone to cover Emery's care, so approximately $54,853 was unaccounted for.

The evidence summarized above supports the jury's finding beyond a reasonable doubt that Frias engaged in some misleading or deceptive representation to carry out her wrongful act of taking Emery's money. Frias knew Emery had told her to use Emery's money to pay Emery's bills first, then ask and get Emery's approval before using her money for Frias. Frias repeatedly presented blank checks to Emery and accepted Emery's signed but otherwise blank checks from Emery for that purpose. Each time that Frias accepted a signed check that Emery offered her for that purpose, Frias misrepresented to Emery that she had been using, was using, and would use Emery's money to take care of Emery's financial obligations first. Emery relied on that course of conduct, expecting Frias to pay her bills. That Emery put a hold on her account once she learned how Frias was spending her money shows her disapproval—not her permission, not a gift.

Frias behaved in a way calculated to make Emery believe something untrue. Frias' notations on the memo lines are likely insufficient, viewed in isolation, to show Frias' false pretenses, since no evidence showed that Emery saw or relied on them. Still, the notations help show Frias' intent or general scheme to deceive Emery. Writing on a check's memo line usually indicates the purpose of the payment, yet Frias offered no rational explanation for routinely writing the name of Emery's facility on checks that Frias used to pay for items unrelated to that facility. The notations would likely reinforce to the bank or others who saw them the deception or pretense that Frias was using Emery's money to pay Emery's bills, as Emery had required.

Frias argues that a deception must involve a misrepresentation of a past or present fact—not a false promise to act, citing *State v. Hamilton*, 6 Kan. App. 2d 646, 649-50, 631 P.2d 1255 (1981). She contends that the evidence shows, at most, that she induced Emery to rely on her future promise to pay Emery's bills. But *Hamilton* was a theft by deception case, unlike this one. And its teaching that a false promise is not a false pretense was designed to prevent a promisor, *whose promise was truthful when made*, from being guilty of a crime merely because the promisor later defaulted. 6 Kan. App. 2d

11

at 649. That scenario is not supported here—no facts suggest that Frias intended to pay Emery's bills but was repeatedly prevented from so doing.

Both sides argued plausible theories, supported by evidence. But we must view the evidence in the light most favorable to the State and cannot reweigh evidence or witness testimony and credibility. *Chandler*, 307 Kan. at 668. Doing so, we are convinced that a rational fact-finder could have found Frias guilty beyond a reasonable doubt of mistreatment of an elder person through false pretense.

## II. DID THE DISTRICT COURT ERR BY NOT GIVING AN AFFIRMATIVE DEFENSE INSTRUCTION?

Frias next contends that the court erred by failing to instruct the jury on her affirmative defense that the money she got from Emery was a gift. Affirmative defenses provide a legally recognized justification for the action such that the actor cannot be held criminally or civilly liable. See *United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977) ("An affirmative defense admits the defendant committed the acts charged, but seeks to establish a justification or excuse."). Frias argues that she presented competent evidence that Emery transferred her funds to Frias as a gift, and that the district court, by preventing the jury from considering her defense, violated her right to due process.

*Standard of Review and Basic Legal Principles*

When a party challenges a jury instruction or the lack thereof:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that

12

would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless . . . ." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

*Analysis*

We first consider whether Frias preserved her claim of error. Frias never asked the district court to give an affirmative defense instruction. Because Frias asserts instructional error for the first time on appeal, the court's failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. See K.S.A. 2020 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). The clear error standard requires reversal only if an error occurred and the court is firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012). Frias, as the party claiming clear error, has the burden to prove the necessary prejudice. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

We next determine whether the instruction would be legally appropriate. *Plummer*, 295 Kan. at 161. This means the instruction must accurately and fairly state the law as it applies to the crimes charged. See 295 Kan. at 161 ("For instance, a lesser included offense instruction would be inappropriate if the described lesser crime is not legally an included offense of the charged crime, *i.e.*, as a matter of law, a lesser included offense instruction must contain a lesser included offense.").

Frias wants a generic instruction that a gift is an affirmative defense to the charged crime. But the elder person mistreatment statute restricts the affirmative defense that money was given as a gift, precluding a generic gift instruction:

13

"It shall be an affirmative defense to any prosecution for mistreatment of a dependent adult or mistreatment of an elder person as described in subsections (a)(2) and (b)(1) that:

"(1) The personal property or financial resources were given as a gift consistent with a pattern of gift giving to the person that existed before the dependent adult or elder person became vulnerable;

"(2) the personal property or financial resources were given as a gift consistent with a pattern of gift giving to a class of individuals that existed before the dependent adult or elder person became vulnerable;

"(3) the personal property or financial resources were conferred as a gift by the dependent adult or elder person to the benefit of a person or class of persons, and such gift was reasonable under the circumstances; or

"(4) a court approved the transaction before the transaction occurred." K.S.A. 2014 Supp. 21-5417(e).

No affirmative defense of a gift, unconstrained by the language of the statute which requires a "pattern," court approval, or reasonableness, is thus possible. The generic "gift" instruction that Frias now desires yet failed to request was not legally appropriate.

Lastly, we ask whether the instruction is factually appropriate. Here, that means the affirmative defense must be supported by competent evidence "which could allow a rational fact finder to reasonably conclude that the defense applies." See K.S.A. 2020 Supp. 21-5108(c). Yet Frias failed to allege that Emery gave her blank checks to Frias as a "gift," and no evidence shows the pattern, reasonableness, or court approval that the statutory affirmative defense requires for gifts. See K.S.A. 2014 Supp. 21-5417(e).

And Frias did not testify that Emery wrote the checks to her as gifts. Instead, she claims to have raised the affirmative defense of gift-giving by testifying that she spent a lot of the money under Emery's instruction, direction, and with her permission, and used the money to buy things for Emery, to maintain Emery's house, and to pay Frias' living expenses. But Frias never characterized the transactions as a "gift," which would have

14

been a simple way to explain matters to the jury. To the contrary, she testified that she "spen[t] the money as [Emery] instructed and allowed or whatever she told me to do, I did it, and *whatever I asked, if she said okay, then I could do that*." When money is a gift, one need not ask permission to use it in a specific way.

We are not persuaded that Frias' testimony, even considered in isolation, and viewed in the light most favorable to her, raises any affirmative defense or shows any gift-giving. And considering *all* the evidence, as we must, in that light, we find none suggesting that Emery's blank checks that Frias made payable to herself were gifts to Frias. Because an instruction on the affirmative defense of a gift was not legally or factually appropriate, the district court properly did not raise the instruction on its own. See *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

III.    DID THE DISTRICT COURT ERR BY DENYING FRIAS' MOTION FOR NEW COUNSEL?

Frias next argues that the district court erred by denying her posttrial motion for new counsel, forcing Pittman to advocate for her in her motion for a new trial and during sentencing. Frias asks us to remand for resentencing.

*Standard of Review*

"The decision to appoint substitute counsel depends on the circumstances of the case, and the district court possesses broad discretion in determining whether to appoint substitute counsel." *State v. Brewer*, 49 Kan. App. 2d 102, 113, 305 P.3d 676 (2013). A district court must make an appropriate in-depth inquiry if it becomes apparent that a potential conflict of interest exists. *State v. Sharkey*, 299 Kan. 87, 96, 322 P.3d 325 (2014). If the district court makes an appropriate inquiry, we review the district court's decision to deny a motion to withdraw counsel for abuse of discretion. *State v. Stovall*, 298 Kan. 362, 370, 372, 312 P.3d 1271 (2013).

15

"Judicial discretion is abused if judicial action is (1) arbitrary, fanciful, or unreasonable, i.e., no reasonable person would take the view adopted by the trial court; (2) based on an error of law . . . ; or (3) based on an error of fact . . . . The defendant bears the burden of showing the court abused its discretion." *Stovall*, 298 Kan. at 370. Failure to make an adequate inquiry when the court is aware of the potential conflict constitutes an abuse of discretion. *State v. Marshall*, 303 Kan. 438, 447, 362 P.3d 587 (2015).

*General Legal Principles*

While both our state and federal Constitutions guarantee the right of criminal defendants to have the effective assistance of counsel, they do not guarantee the defendant the right to *choose* which attorney will be appointed to represent him or her. *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014).

> "'[T]o warrant substitute counsel, a defendant must show 'justifiable dissatisfaction' with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. But ultimately, "'[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel.'" [Citations omitted.]' *State v. Sappington*, 285 Kan. 158, 166, 169 P.3d 1096 (2007).

> "Further, when the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction. *State v. Smith*, 291 Kan. 751, 755, 247 P.3d 676 (2011)." *State v. Breitenbach*, 313 Kan. 73, 90-91, 483 P.3d 448 (2021).

*Application*

In her letter to the district court, Frias stated she had asked about and intended to file a complaint against Pittman with the Office of the Disciplinary Administrator. She asked the court to appoint her new counsel who would help her file appropriate motions before sentencing.

At the start of the motions hearing, the district court asked Frias why she wanted new counsel. Frias responded that Pittman was unavailable to answer questions and should have consulted with her before filing a motion for a new trial. She agreed that the motion should be filed but she wanted to tell Pittman the best way to do it. She thought Pittman's filing the motion on her behalf was "sneaky." Frias then stated she "found" the concept of ineffective assistance of counsel and wanted to explore that basis for a new trial. Ultimately, she wanted a continuance and a new attorney to review her options for a new trial or judgment of acquittal and to counsel her on an ineffective assistance of counsel claim. The court then asked for defense counsel's response and he replied only that he did not need Frias' permission to file appropriate motions on her behalf.

Frias failed to show justifiable dissatisfaction with Pittman, as her statements do not show a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between herself and her counsel. See *Breitenbach*, 313 Kan. at 90. The closest Frias came to alleging a breakdown in communication was to say that she and Pittman were not "jelling," but this statement was not enough to warrant substitute counsel. Frias did not allege that the two had an irreconcilable disagreement. Rather, Frias and Pittman were trying to file the same posttrial motions, but Frias wanted to control their contents. Of course, she had no right to do so. See *State v. Rivera*, 277 Kan. 109, 116-17, 83 P.3d 169 (2004) (finding criminal defendants are charged with deciding what plea to enter, whether to waive jury trial, and whether to testify, but strategical and tactical decisions like preparation, the type of defense, and filing motions lie with defense

17

counsel, who is not required to specifically consult with the defendant first). Frias mentioned her desire to explore the concept of ineffective assistance of counsel, but she did not specifically allege a "conflict of interest." And her other allegations about Pittman—such as that he did not have her best interest in mind and was misleading her—are too lacking in factual detail to trigger the district court's duty to inquire.

But even if we assume that Frias showed justifiable dissatisfaction, triggering the district court's duty to inquire, the district court met that duty—it asked Frias an open-ended question that sufficed as inquiry into a potential conflict. See *State v. Toothman*, 310 Kan. 542, 554-55, 448 P.3d 1039 (2019); *State v. Meadows*, No. 121,223, 2020 WL 4909717, at *2 (Kan. App. 2020) (unpublished opinion). The district court read her letter, allowed Frias to explain why she wanted new counsel, considered her long response, solicited input from counsel, and then made a reasonable decision. The district court heard all of Frias' complaints and assessed Pittman's conduct and their attorney/client relationship. Finding no abuse of discretion, we affirm the district court's decision to deny Frias' motion for new counsel.

IV.     DID THE DISTRICT COURT ERR IN SENTENCING FRIAS?

As her final issue, Frias contends that the court erred by ordering restitution in March 2020 without setting up a payment plan. Frias relies on *State v. Roberts*, 57 Kan. App. 2d 836, 461 P.3d 77 (2020), *vacated and remanded* 2020 WL 8269363, at *1 (2020), which was in effect when she was sentenced. *Roberts* held that the statute, by referring to "the plan established by the court for the payment of restitution," required the district court to set a restitution plan. See K.S.A. 2019 Supp. 21-6604(b); 57 Kan. App. 2d at 838-39. Frias seeks remand to the district court so it can set a restitution plan.

We find it unnecessary to recite the history of *Roberts*, the legislative changes to the statute in response to that case, or the Supreme Court's vacating *Roberts* based on

18

those legislative changes. None of that matters here because the district court, while imposing Frias' sentence from the bench, ordered a restitution plan:

> "I'll make a recommendation to the Kansas Department of Corrections that the $54,853.15 be made part of your post-release supervision. And that a payment plan be that the $54,853.15 will be divided up into 24 equal payments and you will be ordered to pay that amount each month."

The journal entry of judgment reinforces that restitution plan in the court's comments recapping the sentence: "Court finds that the restitution be paid according to the following plan: 24 equal installments totaling $54,853.15, due upon defendant's release from prison." Because the sentence imposed fulfills the terms of the statute in effect in March 2020, see K.S.A. 2019 Supp. 21-6604(b), the district court did not err in sentencing Frias, and no purpose would be served by remand.

Affirmed.